**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**FRANKLIN ATLAS CORPORATION, John L. deLyra, Walter Elmatti, Jack Gold, I. W. Page & Co., Inc., Defendants.**

United States District Court
S. D. New York.
March 26, 1959.

Paul Windels, Jr., New York City, Regional Administrator for the Securities and Exchange Commission.

Esther Antell, Atty., Securities and Exchange Commission, New York City, for plaintiff.

John T. Sullivan, New York City, for defendants Franklin Atlas Corp. and John L. deLyra.

Edward Nathan and Malcolm S. Mason, New York City, for defendant Walter Elmatti.

John J. McKenna, New York City, for defendants Jack Gold and I. W. Page & Co., Inc.

DAWSON, District Judge.

This action, tried by the Court without a jury, is one where plaintiff seeks a permanent injunction against the defendants Jack Gold (hereinafter called "Gold") and I. W. Page & Co. (hereinafter called "Page"), to enjoin them from violating the registration provisions [1] and the antifraud provisions [2] of the Securities Act of 1933, as amended. See 15 U.S.C.A. § 77t(b). The action against the other defendants, Franklin Atlas Corporation, John L. deLyra and Walter Elmatti, for the same relief, was brought to a conclusion on December 15, 1958, by the entry of a final injunction, consented to by these defendants, enjoining them from further violation of the registration and anti-fraud provisions of the Act.

The defendants Page and Gold, in a commendable effort to aid in the prompt disposition of the action against them, entered into a stipulation of facts, dated December 23, 1958, and this action against these two remaining defendants is to be determined on this stipulation of facts, the pleadings and all other proceedings in this action.

### Preliminary Proceedings

The complaint was filed in May, 1957, and on the same day a temporary restraining order was signed. At the same time the plaintiff applied for a preliminary injunction against all the defendants. On August 16, 1957, Judge Levet granted the preliminary injunction against defendants Franklin Atlas Corporation, John L. deLyra and Walter Elmatti, but denied a preliminary injunction against the defendants Page and Gold. D.C.S.D.N.Y.1957, 154 F. Supp. 395. The denial of the injunction against the defendants Page and Gold was on the ground that "there is no indication that either Page or Gold contemplates selling any of the Franklin stock. They appear to have readily obeyed all mandates of the Commission."

### The Issues

Prior to the time of the trial of this action a pre-trial conference was held at which the issues to be tried by this Court were defined as follows:

(1) Whether the defendants have been, and whether they are selling securities, namely shares of the Class A common stock of Franklin Atlas Corporation, and in connection therewith using the mails and means and instruments of transportation and communication in interstate commerce;

1. 15 U.S.C.A. § 77f.

2. 15 U.S.C.A. § 77e.

(2) Whether any sales of securities of Franklin Atlas by the defendants or any of them, to the public, were made pursuant to exemption of the registration requirements of the Securities Act of 1933;

(3) Whether the defendants in the sales of Class A common stock of Franklin Atlas Corporation, if such sales were made by them, did make and have been making untrue statements of material facts and omitting to state the material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, such statements being those statements listed in the subdivisions of Paragraph 12 of the complaint and none other.

## Findings and Conclusions

The Court, after having received the stipulation of facts, and having tried the issues, finds the facts on the disputed issues to be as follows:

(1) Defendant Page was and is a New York corporation doing business as a broker and dealer in securities in New York City, and was and is, since September 6, 1956, registered as a broker-dealer in securities pursuant to § 15(b) of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78o(b)); Page has not engaged in any securities transactions since September 15, 1957.

(2) Defendant Gold is and was president, treasurer, director and sole stockholder of Page and in full control of said firm.

(3) Franklin Atlas Corporation was a New York corporation organized in 1954 for the purpose of engaging in real estate transactions, with offices at 80 Wall Street, New York City; John L. deLyra was at all times manager and administrator of Franklin Atlas Corporation which was controlled by members of the deLyra family.

(4) On July 6, 1955, Franklin Atlas filed a Letter of Notification under Regulation A with the New York Regional Office of the Securities and Exchange Commission, covering a proposed offering of $150,000 of 6% convertible debentures, 149,000 shares of Class A common stock at $1 a share, and 53,800 shares of Class B stock at 1¢ per share. On April 5, 1956, nine months later, Franklin Atlas filed a form with the Commission, in which it reported it was withdrawing the unsold balance of the offering and that as of March 31, 1956 it had sold a total of one debenture, 104,900 shares of Class A stock and 18,040 shares of Class B stock, for a total of $106,080. 75,000 shares of the Class A stock thus reported to have been sold were reported to have been sold on March 30, 1956 to the defendant Walter Elmatti at $1 a share, and the proceeds of $75,000 were included in the total proceeds allegedly received. Walter Elmatti had paid for his 75,000 shares of stock with his check for $75,000, which was returned by the bank on April 2, 1956 for insufficient funds, and this check was never made good. Although this stock had never been paid for by the alleged purchaser on this public offering, nevertheless around March 20, 1957 John L. deLyra and Walter Elmatti arranged for the sale to Gold of 20,000 shares of Franklin Atlas stock out of the 75,000 shares issued in Elmatti's name on March 30, 1956, as aforesaid, at the rate of $1.25 a share, with the understanding that such shares would be paid for by Gold through Page. Between March 29, 1957 and May 7, 1957, Page sold to its customers a total of 14,250 shares of such Franklin Atlas stock at $1.75 a share, for a total of approximately $25,000, and Page received full payment for such stock from its customers and paid $6,250 to Elmatti. The 14,250 shares sold by Page were all part of the shares which originally had been reported as having been sold by Franklin Atlas to Walter Elmatti and for which he had never paid. Nevertheless, on or about April 25, 1957, Page sent a letter to Franklin Atlas enclosing a certificate issued in the name of Elmatti and requesting transfer into the names of its various customers for the shares allegedly sold

by Page. Gold and Page learned in May, 1957, and before any stock was delivered to their customers, that the certificate for the 20,000 shares might have been sold once before by Walter Elmatti. Early in May 1957 and before any stock was issued out of this certificate in the name of any of Page's customers, the Securities and Exchange Commission informed Page and Gold "that the S.E.C. had raised serious objections concerning the source of Elmatti's stock and the availability of exemption with respect to the sale of these shares." When Page and Gold requested that deLyra and Elmatti replace these shares by a certificate upon which there could be no question, Elmatti and deLyra arranged with Gold that shares standing in the name of Mrs. Virginia Tufaro be used as substitute shares for the Elmatti stock. Mrs. Tufaro is the niece of John deLyra and the shares received by Mrs. Tufaro were part of a liquidating dividend as a consequence of a merger effected between Jamar Management Corporation and Franklin Atlas Corporation under the terms of which Franklin Atlas issued 100,000 shares of Class A common stock to Jamar Management Corporation in consideration of an apartment house owned by Jamar. Gold and Page determined to borrow these shares from Mrs. Tufaro and to make delivery out of them to their customers to whom shares had been sold by them. They maintained that this was "free" stock by virtue of Rule 133 of the General Rules and Regulations of the Securities and Exchange Commission.[3] They secured from an attorney by the name of Edward Gedalecia an opinion that receipt by Mrs. Tufaro of this stock did not constitute a sale by virtue of this Rule 133. Nevertheless, they did not transfer the shares to their customers because of the existence of the temporary restraining order

entered against them on May 10, 1957. Thereafter Judge Levet declined to issue the temporary injunction against Gold and Page. Shortly thereafter, and on or about September 15, 1957, Gold and Page delivered the shares of Franklin Atlas stock to the customers to whom they had sold it, and the shares so delivered were derived from the 20,000 shares certificate "borrowed" from Mrs. Tufaro.

(5) In connection with the sales of stock by Page and Gold to its customers, Page and Gold made use of the mails and means and instruments of transportation and communication in interstate commerce. They circularized purchasers and prospective purchasers with a circular designated as a "Special Report" which had been furnished by John deLyra. They also circularized purchasers and prospective purchasers with a "bulletin" on Franklin Atlas. This "bulletin" contained a reprint of an illustrated news article which had appeared in the New York Times. References were made to this "Special Report" and to this "bulletin" in the opinion of Judge Levet, as well as to the article which had been published in the New York Times and which was included in the "bulletin." The circular and the "bulletin" depicted a glowing picture of an active real estate concern that was planning to erect a 33-story skyscraper on Wall Street, with entrances on Wall, Pearl and Water Streets. The "bulletin" included a statement that "a site has been assembled and plans have been completed for a thirty-three-story office building at the northeast corner of Wall and Pearl Streets" and "the Pearl Street Building was purchased by the Franklin Atlas Corporation from Angelo Calcagnini." As a matter of fact a site had not been assembled for any such building,[4] nor had the Pearl Street building been acquired by Franklin Atlas. A

---

3. Mrs. Tufaro was a niece of John L. deLyra. The deLyra family controlled Jamar Corporation and was in working control of Franklin Atlas. Under the circumstances Rule 133 has no applicability to any sale by Mrs. Tufaro of her stock. See Securities and Exchange Comm. v.

Micro-Moisture Controls, Inc., D.C.S.D. N.Y.1957, 148 F.Supp. 558, 562.

4. "Franklin Atlas never acquired nor had any record title to any property adjoining or abutting on Pearl, Wall or Water Streets, New York City." Stip. par. 61.

memorandum for the sale and purchase had been entered into, but Franklin Atlas did not at that time, or at any time thereafter, have the money required to be paid for the erection of the building.[5] Part of the plot on which the proposed skyscraper was supposed to be built is occupied by Angelo's Restaurant and the "bulletin" indicated that negotiations had been arranged for the acquisition of this plot. A contract of sale for the plot had been entered into, but the payments to be made by Franklin Atlas thereunder were not made, and on August 2, 1956 the attorney for the owners of 160 Pearl Street and Angelo's Restaurant wrote to the attorney for Franklin Atlas notifying him of the cancellation of the contract of sale relating to 160 Pearl Street and the Angelo's Restaurant property. A contract for the purchase of the premises at 80 Wall Street, which was part of the site alleged to have been acquired for the proposed skyscraper, was entered into between Franklin Atlas and the stockholders of the Anasae Realty Corporation, owners of the premises, on April 12, 1956, which contract provided in part that the sellers were to receive a certified check for $759,000 at the closing or the contract should be null and void. Franklin Atlas did not ever pay the $759,000 to Anasae, nor did it have the funds to make such payment; and the contract was not closed on November 15, 1956 as provided in the agreement of sale, nor did Franklin Atlas ever acquire title to the premises at 80 Wall Street, New York City.

(6) The representations contained in the selling literature used by Franklin Atlas and by Page and Gold were false and fraudulent in that they indicated that Franklin Atlas had acquired certain valuable real estate and was planning to build a skyscraper thereon, when Franklin Atlas in fact had not acquired this real estate, did not have funds with which it could acquire the real estate, or the funds with which to erect a skyscraper thereon. What were stated as mat-

ters of fact in the selling literature were nothing more than gleams in the eyes of the promoters. Page and Gold may have relied upon the representations of John deLyra, but as brokers and underwriters they had a more serious obligation to the public to whom they were offering the stock. There is no indication that they made careful investigation of the underlying facts to ascertain whether Franklin Atlas had in fact acquired title to the property, as it represented, or whether Franklin Atlas had the necessary resources to build the skyscraper, as it represented it had. The purport of Judge Levet's opinion, handed down on August 16, 1957, indicated that the representations made by Page and Gold and Franklin Atlas in connection with the sale of Franklin Atlas stock had been false and fraudulent. He restrained Franklin Atlas and John deLyra from further sales of the stock; he did not restrain Page and Gold from further sales but apparently only on the basis that there was no indication that they intended to sell any further stock.

■ (7) Responsible broker-dealers under those circumstances would have realized that there was an imperfection in the sales which Page and Gold had previously made of shares of stock of Franklin Atlas and which they had been making theoretically out of the Elmatti stock, but which they now wished to cover by stock borrowed from Mrs. Tufaro. If Page and Gold had shown complete honesty they would at that moment have offered to rescind those purchases and return the money to their customers. Nevertheless, they did not do this but scurried around trying to borrow stock to cover the previous sales so that they might retain the proceeds of those sales. They then delivered to their customers, after Judge Levet's opinion had come down, stock out of the certificate borrowed from Mrs. Tufaro. A delivery of shares is in and of itself a "sale" of those shares within the definition of "sale" in § 2(3) of the Act. 15 U.S.C.A.

5. Its bank account on August 1, 1956 showed a balance of $931.60 and on November 1, 1956 of $4.42.

§ 77b(3). Schillner v. H. Vaughan Clarke & Co., 2 Cir., 1943, 134 F.2d 875; Moore v. Gorman, D.C.S.D.N.Y.1948, 75 F.Supp. 453.

■ Therefore, irrespective of the question as to whether the Tufaro stock was "free" stock, Page and Gold did make a "sale" of Franklin Atlas stock, within the definition of the Act, after the date of Judge Levet's opinion, and such sale was a completion of transactions which had been false and fraudulent in that they were induced by false and fraudulent representations made in the selling literature. It would be a strange situation indeed if a broker-dealer could sell securities by false and fraudulent representations and then claim that he might make delivery of "free" stock and thereby absolve himself of liability for the false and fraudulent representations. The Court finds, as a matter of fact, that the defendants Page and Gold have been selling shares of Class A common stock of Franklin Atlas Corporation, and in connection therewith using the mails and instruments of transportation and communication in interstate commerce, and that in the making of such sales they had been making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The Court concludes that Page and Gold have violated the anti-fraud provisions contained in § 17 of the Securities Act of 1933, 15 U.S. C.A. § 77q.

■ (8) The next question is whether Page and Gold violated the registration provisions of the Securities Act of 1933, as amended.

Section 77e of Title 15 U.S.C.A., provides in part:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

\* . \* \* · \* \* \* ·

"(2) to carry or cause to be carried through the mails or in inter-state commerce, by any means or instruments of transportation, any such security for the purpose of \* \* \* or for delivery after sale."

Therefore, if the Franklin Atlas stock was a security required to be registered, as it was, it was illegal to use any means of transportation for delivery after sale, and defendants have stipulated that they sold shares of Franklin Atlas stock; that this stock was not registered and that they delivered shares of Franklin Atlas stock to their customers. The fact that they "borrowed" shares to make deliveries makes no difference. The original sale was intended to be shares of the Elmatti stock, for which no exemption was obtained by the Regulation A statement. With respect to these shares, there was no compliance with the Regulation A filing since, among other things, the stock had not been paid for by Elmatti at the offering price of $1 a share, and in fact had not been paid for at all. Page and Gold were not selling stock on behalf of Franklin Atlas, as issuer. They were selling stock on behalf of Elmatti, who had purported to buy it but had not paid for it, and who therefore had no valid stock to offer for sale. Elmatti is found by the Court to be part of the group who were in control of Franklin Atlas and as such the sale of his stock would have required registration.

Under all the circumstances, delivery of the Franklin Atlas stock after the purported sale and when no registration statement was in effect, was a violation of the registration provisions of the Securities Act of 1933.

### Conclusions

The Court finds that Page and Gold violated the anti-fraud provisions of the Securities Act of 1933 in their offer and purported sale of the Elmatti stock by means of false and misleading representations. Their delivery, by means of the mails or instruments of commerce, of the certificates to complete the sale, which they previously had made, consti-

tuted a violation of the registration provisions of the Securities Act of 1933.

■ The Court having found that Page and Gold had willfully violated the anti-fraud and registration provisions of the Securities Act of 1933, the question arises as to whether it is proper to issue the permanent injunction sought by the plaintiff. There has been no evidence that the illegal activity of the defendants has continued in recent months. The question, on the issuance of a permanent injunction, is whether there is a likelihood that the illegal acts will be continued. The provisions of the Securities Act of 1933, relating to the issuance of an injunction, are not intended to be punitive in nature. Securities and Exchange Comm. v. Graye, D.C.S.D.N.Y. 1957, 156 F.Supp. 544, 545.

■■ The Court cannot too strongly condemn the activities of Page and Gold in the past. They may have been the result of ignorance or carelessness, but in any event they certainly displayed a callous disregard for the rights of prospective investors and of those high standards which should be employed by all brokers and dealers. It may well be that a revocation of any broker-dealer authorization would be justified under the provisions of the Securities Exchange Act of 1934, but that issue is not something for this Court to decide. However, the plaintiff has not presented proof that there is any present danger that the defendants will continue on this course of illegal conduct or that there is any reasonable likelihood of further violations in the future.[6] For about a year and a half the defendants have not engaged in any securities transactions; they allege that they are now out of business. Under the circumstances the plaintiff has not established the necessity for the drastic remedy of a permanent injunction. Insofar as the action seeks a permanent injunction against Page and Gold that relief is denied.

6. "The ultimate test is whether the defendant's past conduct indicates—under all the circumstances and not merely in view of the time which has elapsed since

Let judgment be entered accordingly.

This opinion shall constitute the findings of fact and conclusions of law of the Court.

the last violation—that there is a reasonable likelihood of further violations in the future." Loss, Securities Regulation (1951) p. 1165.