**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**JOHN ADAMS TRUST CORPORATION, Defendant.**

**Civ. A. No. 86–2423–WD.**

United States District Court, D. Massachusetts.

Oct. 14, 1988.

D. Robert Cervera, Thomas J. Rappaport, S.E.C., Boston, Mass., for plaintiff.

Celio Moore, Goodwin, Procter & Hoar, Boston, Mass., by appointment of the court, for Trust.

Peter J. Schneider, Constance. M. McGrane, Burns & Levinson, Boston, Mass., for Corey.

John L. Whitlock, Palmer & Dodge, Boston, Mass., for Thomas N. Blake, Arthur Young & Co., receiver of John Adams Trust Corp.

### MEMORANDUM

WOODLOCK, District Judge.

This memorandum marks the quiet interment of the remaining defendant in this

case, whose spectral legal existence need no longer require federal judicial attention.

The plaintiff Securities and Exchange Commission commenced this action with *ex parte* filings submitted on an emergency basis to protect the customers of an investment adviser gone awry and to obtain injunctive relief against the principal of the adviser and his affiliates.

A skilled receiver thereafter appointed by the court has acted successfully to make whole the customers of the errant investment adviser firm. The principal of the adviser entity and all associated with him in misfeasant activity have been enjoined permanently from continued breaches of their statutory and regulatory obligations. The remaining defendant entity is now a defunct and insolvent corporation whose registration the Commission has cancelled after specifically finding that the entity "is no longer conducting business as an investment adviser."

Nevertheless, the Commission doggedly continues to seek a pound of flesh from the incorporeal adviser entity. The Commission, by a request for a permanent injunction against that entity, presses me to enter a final injunctive decree restating statutory and regulatory provisions and ordering this lifeless corporate shell to comply with federal securities law.

Equity, however, does not sit to strangle a corpse.

Because I find such an idle judicial gesture to be an unwarranted exercise of the court's equitable jurisdiction, I decline to grant the Commission's request and now dismiss this action.

## I

The case first came before me on an emergency *ex parte* application by the Se-

curities and Exchange Commission for a temporary restraining order against John Adams Trust Corporation ("JAT") and its chairman and sole shareholder, Milton Adams Corey. The Commission's complaint, dated August 18, 1986, alleged violations of provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–4, 80b–6, 80b–7. The alleged violations included material misstatements on registration forms, fraudulent misrepresentation of liabilities, improper retention of client funds, deficient record keeping, failure to verify client funds, and failure to disclose JAT's precarious financial condition.

The Commission based its request for an *ex parte* temporary restraining order on the immediate need—shown by an affidavit which it submitted and testimony which I required—to protect investors from further impairment of their funds and to prevent continuing violations of the securities laws and SEC rules.

A temporary restraining order was entered and was subsequently extended several times at the request of the parties. On September 17, 1986, one month after entry of the original temporary restraining order, Mr. Corey consented to entry of a final judgment of permanent injunction against him.

That decree broadly enjoined "Milton Adams Corey and his agents, servants, employees, and all persons in active concert or participation with him ..." from engaging in violations of the securities laws in connection with the conduct of any investment adviser business and of JAT in particular.[1]

---

1. The addressees of the injunction were enjoined from:

"I

... with respect to any client of John Adams Trust Corporation ("JAT") or any other investment adviser, or client of any other person or entity subject to federal securities laws, from directly or indirectly, singly or in concert, by the use of the mails or any means or instrumentalities of interstate commerce:
(1) employing any device, scheme or artifice to defraud any such client; or

(2) engaging in any transaction, practice or course of business which operates as a fraud or deceit upon any such client; or
(3) engaging in any act, practice or course of business which is fraudulent, deceptive or manipulative or which operates or would operate as a fraud or deceit upon any person; or
(4) making any untrue statement of material fact, or omitting to state any material fact necessary in order to make the statements made, in the light of the circumstances under

Meanwhile, JAT—which was as an entity not represented by counsel—appeared to be insolvent and incapable of accounting for or servicing client funds appropriately. Consequently, on the Commission's motion, I appointed a receiver for JAT on August 22, 1986. The receiver, Thomas M. Blake, a member of the firm of Arthur Young & Co. and an accountant for whose professionalism I had high regard, was authorized to manage JAT's assets; to audit, investigate, and evaluate its books and records; and to render an accounting of all of its funds and accounts.

The receiver thereafter filed two written reports with the court detailing his findings regarding JAT's business and his remedial efforts. The receiver found a wholesale breakdown in the conduct of JAT's business for its clients while it was under the supervision and control of Mr. Corey.[2] The management failings reported by the receiver were major.

First, JAT never established an effective custodial relationship with its putative custodian, State Street Bank. As a consequence, the firm's corporate and trust funds were commingled without effective internal controls.

Second, JAT often generated inaccurate customer account statements and frequently invested assets not in accordance with instructions by clients.

Third, by delaying the investment of client funds, JAT's own corporate checking account received interest which properly should have been credited to customers.

Fourth, Mr. Corey on several occasions transferred monies, without authorization, from customer accounts to the JAT corporate account. Because of the lack of an effective custodial relationship with State Street Bank and the lack of effective internal controls, JAT was able without detection to transfer to its own accounts over $33,000 in fees beyond those authorized. In a final accounting, the receiver computed that there was a total shortfall of $45,526 in customer accounts held by JAT.

Moreover, JAT itself was insolvent. When JAT's operations were suspended by the receiver on September 30, 1986, after all employees had left the firm and its premises were vacated because it could not pay the landlord, the outstanding debts

---

which they were made, not misleading; including but not limited to:

A. aiding and abetting any investment adviser or any other person or entity that has custody or possession of any funds or securities in which any client has a beneficial interest, or taking any action with respect to such funds or securities, unless they are verified by actual examination at least once each calendar year by an independent public accountant;

B. aiding and abetting any investment adviser or any other person or entity in misrepresenting to clients or prospective clients material facts relating to the financial condition of any investment adviser or other person or entity that is subject to federal securities laws; and

C. aiding and abetting any investment adviser or any other person or entity in using funds or securities in which any client has a beneficial interest for the advantage of any person or entity other than the client, without the knowledge and consent of the client;

in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. 78j(b)] and Rule 10b–5 promulgated thereunder [17 C.F.R. 240.10b–5], and Section 206 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. 80b–6] and Rule 206(4)– 2(a)(5) thereunder [17 C.F.R. 275.206(4)– 2(a)(5)].

II

… making any untrue statement of a material fact in any registration application or report filed with the Commission under Section 203 of the Advisers Act, or willfully omitting to state in any such application or report any material fact which is required to be stated therein, in violation of Sections 203 and 207 of the Advisers Act [15 U.S.C. 80b–3 and 80b–7].

III

… failing to make and keep such true, accurate, and current books and records relating to any investment advisory business as are required by Section 204 of the Advisers Act [15 U.S.C. 80b–4] and Rules 204–2(a) and (b) thereunder [17 C.F.R. 275.204–2(a) and (b)]."

**2.** Because there was no factual development of the circumstances of control after Mr. Corey consented to entry of a permanent injunction, it is difficult to say with certainty precisely what operational role he was playing during the terminal stages of JAT's activities. It appears that the breakdown in JAT's procedures were identified by his subordinates and accountant and brought by them to the attention of the authorities at a time when Mr. Corey was withdrawing from day-to-day operations of JAT.

were at least $183,737, and the total assets were $383.53 in the corporate checking account.

Undaunted, the receiver deployed the resources of Arthur Young & Company to process the customer accounts, and arranged with court approval for the transfer of the customer accounts to a responsible fiduciary, the Southeast Bank for Savings in Dover, New Hampshire. The receiver also entered into negotiations with State Street Bank and Trust concerning the losses from JAT's trust accounts; State Street agreed to reimburse the $45,526 in trust account losses. In addition, the receiver made the customers whole by arranging disbursement of $214,977.90 in cash in two distributions. Finally, he supervised the transfer of customer securities as directed by former JAT account holders either to the Southeast Bank for Savings or to the account holders themselves.

Creditors did not fare so well. Despite the skill of the receiver, unpaid accounts at the conclusion of the receiver's efforts stood at $237,015.29. The largest single creditor was the receiver's firm, Arthur Young & Company, whose unpaid account as a result of the receiver's Herculean efforts was $49,508. Counsel to the receiver, John L. Whitlock of the law firm of Palmer & Dodge, was left with an unpaid account of $4,550. Neither the diligent receiver nor his able counsel sought or obtained any monetary compensation for his work.

At the conclusion of their work, the receiver and his counsel sought discharge and reported to the Court that JAT was "no longer a viable entity." In the arresting image of the receiver's counsel, the remaining legal entity was "not worth the powder to blow it up."

Not satisfied with the permanent injunction immobilizing Mr. Corey, who appears to have been the moving force behind JAT's misfeasance, nor with the effective cessation of JAT as a business entity as a result of the winding down of JAT's corporate affairs by the receiver, the Commission continued to press for a permanent injunction broadly prohibiting JAT from further violation of the securities laws.

Under the terms of the extended restraining orders, JAT was to be subject to an injunction only until the receiver was discharged. On April 3, 1987, a hearing was held on the receiver's request to be discharged and on the Commission's motion for a permanent injunction.

The receiver quite properly declined to take a position whether a permanent injunction should be entered against JAT after his discharge. Accordingly, in connection with the permanent injunction motion, I appointed Celia D. Moore, Esq., to appear as uncompensated *amicus curiae* in order to represent the interests of the otherwise unrepresented defendant JAT.

During the course of the hearing I inquired of the Commission whether any action had been taken to revoke the investment adviser registration of JAT. I was informed that despite a pending staff recommendation the Commission itself had not yet acted on this front, although its emergency *ex parte* request for court action to protect against immediate and irreparable harm had been presented almost eight months earlier.

Some four months after the hearing, on July 30, 1987, the Commission issued an "Order Cancelling [JAT's] Registration Pursuant to Section 203(h) of the Investment Advisers Act of 1940." [3] Section 203(h) requires the Commission to cancel an investment adviser's registration when it finds that the adviser "is no longer in existence or is not engaged in business as an investment adviser." 15 U.S.C. § 80b–3(h). The Commission found that JAT was not engaged in business as an investment adviser.

Although I discharged the receiver at the hearing on April 3, 1987, I have withheld decision on the Commission's request for a permanent injunction in order to permit

**3.** Although the "Order Cancelling Registration" is dated July 30, 1987, a letter dated July 8, 1987 was written to the court advising that on June 25, 1987, the Commission cancelled JAT's registration. No explanation has been offered for the disparity between the date of cancellation on the "Order" itself and that reported in the letter of advisement.

time to tell whether further activities violative of federal securities law might be undertaken through JAT. During the past 18-month period, JAT has not been subject to any injunctive decree, the previous temporary orders having lapsed with the discharge of the receiver. No further activity by JAT has been reported and the Commission has informed the clerk that it has no further evidence to offer in support of its request. The Commission, however, does not recede from its request for a permanent injunction.

## II

The federal courts are vested with wide discretion when an injunction is sought to prevent future violations of the statutory securities laws. The appropriate standard for issuance of an injunction in such cases is the reasonable likelihood of future violations of the statutory provisions. *SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1100 (2d Cir.1972); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (court must determine "that there exists some cognizable danger of recurrent violation"); *cf. SEC v. World Radio Mission*, 544 F.2d 535, 541 (1st Cir.1976) (finding that future violations are likely to occur entitles SEC to preliminary injunction). Recognition that "[a]n injunction is a drastic remedy, not a mild prophylactic," *Aaron v. SEC*, 446 U.S. 680, 703, 100 S.Ct. 1945, 1959, 64 L.Ed.2d 611 (1980) (Burger, C.J., concurring), has led courts to require not only "positive proof of a realistic likelihood that past wrongdoing will recur," *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir.1977), but also a demonstration that recurring violations are a relatively imminent threat, *SEC v. Dimensional Entertainment Corp.*, 493 F.Supp. 1270, 1278 (S.D.N.Y.1980). The SEC has failed to make such a showing as to JAT in this case.

The Commission supports its request for a permanent injunction by reference to JAT's violations of the securities laws and regulations during the period before appointment of the receiver. The Commission seasons those references with the speculation that further wrongdoing by JAT or unnamed individuals responsible for JAT's conduct cannot be ruled out.

Such reliance on past violations is insufficient in this instance to meet the Commission's burden. Past violations of securities laws do not provide, *ipso facto*, a basis for issuance of an injunction, because they are not in and of themselves indicative of future misconduct. *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 973, 71 L.Ed.2d 111 (1981). This is particularly true here where "positive proof" of the violations—though they are variously characterized by the Commission as "numerous," "recurrent," and "egregious"—relates entirely to an individual, Mr. Corey, who already has been separated from, and restrained in his dealings with, the corporate shell. To suggest that JAT itself, now an insolvent corporation without employees or facilities, may rise phoenix-like from the ashes to do further harm to non-existent clients or an unsuspecting public is more akin to "distant prophecy" than to the requisite showing of a "realistic likelihood" or a "real probability" of violations. *See Dimensional Entertainment Corp.*, 493 F.Supp. at 1278-79.

At the hearing on this matter, in response to an inquiry as to whether evidence existed that JAT had a significant potential for engaging in future violations of the securities laws, counsel for the Commission candidly conceded: "Well, I think that's a matter of speculation. It's hard to measure at this point." Nothing since the hearing—a period during which JAT has not been subject to injunctive decrees—suggests that such speculation has become any more discernible by standard judicial measurement.

The persuasiveness of the Commission's resort to speculation is not enhanced, and the shortcomings of the Commission's failure to establish any measurable threat of further violations is not diminished, by the extraordinary breadth of the injunctive relief requested. The Commission's proposed order is largely a restatement of preexisting statutory and regulatory proscriptions

of evil. The reach of the Commission's request here betrays little of that tailored circumspection which courts must fashion when extraordinary relief is requested of them. *See SEC v. American Bd. of Trade,* 751 F.2d 529, 535–36 (2d Cir.1984) (Friendly, J.).

The appropriateness of equitable relief in this case must also be considered within the full context of the SEC's regulatory authority. Without deprecating the role played by SEC injunctions in the enforcement of the securities laws, one may question the need for a permanent injunction in a case such as this where the Commission took a leisurely approach to the application of its own administrative powers to preclude further wrongdoing by JAT.

The Investment Advisers Act, 15 U.S.C. §§ 80b–1 to 80b–21, provides specific and narrowly tailored remedies for the misconduct here alleged and feared. Section 80b–3(e) provides for the censure, limitation of activities, or suspension or revocation of registration of any investment adviser who violates the securities laws as JAT apparently did.

The standard of proof required of the SEC for these administrative proceedings— preponderance of the evidence, *see Steadman v. SEC,* 450 U.S. 91, 102, 101 S.Ct. 999, 1007–08, 67 L.Ed.2d 69 (1981)—is no more onerous than what this court must require at a minimum in order to impose permanent restraints on JAT. Moreover, the Commission has demonstrated that it is prepared to view the scope of these statutory sanctions broadly. *See Lowe v. SEC,* 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985) (SEC sought order enjoining publication of investment newsletter).

With the passage of time—ten months to the day after the receiver terminated operations of JAT and some four months after the hearing on the permanent injunction— the Commission finally got around to finding that JAT was no longer conducting an investment adviser business and cancelled its registration. In evaluating the equities, a court may properly look to the diligence with which the party seeking the court's assistance has pursued remedies uniquely at its own disposal. Here the Commission, which on the best view of the matter must have concluded that JAT was out of business and consequently did not as a practical matter require a rush cancellation, chose not to press its § 80b–3 remedy with any particular vigor or expedition.[4] Nothing in the Commission's pedestrian treatment of JAT's registration suggests that extraordinary equitable relief by injunctive action is necessary from this Court.

Moreover, the factors traditionally considered by courts in assessing the likelihood of future violations by individuals, on which the Commission relies, are wholly inapposite. The degree of scienter involved, the defendant's recognition of wrongful conduct, the sincerity of his assurances against future violations, and the isolated or recurrent nature of the infraction, *see SEC v. Blatt,* 583 F.2d 1325, 1334 n. 29 (5th Cir.1978); *SEC v. Universal Major Indus. Corp.,* 546 F.2d 1044, 1048 (2d Cir.1976), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977), have little bearing on the likelihood of further *corporate* violations. The contours of these indicia of future obedience to the law are

---

4. It should be noted that no party sought to have JAT ultimately obliterated by corporate dissolution under Massachusetts law. *See generally* Mass.Gen.L. ch. 156B, §§ 99–108. The receiver viewed this as a costly and useless exercise because this insolvent corporation was "not worth the powder to blow it up." The Commission chose not to suggest this procedure, in part no doubt because of its recognition that the power of a federal district court in respect of dissolution is limited. *See Alkire v. Interstate Theatres Corp.,* 379 F.Supp. 1210 (D.Mass.1974). As a consequence, whether the Commission's motion for a preliminary injunction is granted or not, JAT's corporate shell will remain.

The existence of the shell, however, is a neutral factor which becomes a matter of judicial concern only if the structure is capable of being appropriated for an improper use. In the instant circumstance, as a result of the Commission's belated cancellation of JAT's investment adviser registration, the use of the shell to conduct an investment adviser business is already proscribed.

strained beyond recognition when applied to a corporation—especially a moribund entity such as JAT.[5] Those factors focus largely on the personal characteristics of defendants to be enjoined. To attempt to apply to JAT such measures of personal contrition and moral regret over wrong done serves only to underscore their irrelevance to a non-corporeal entity without "a soul to damn or a body to kick."[6]

### III

Although lacking a body and soul, JAT has had the benefit of the best professional accounting and legal services money could buy. Of course, money did not buy those services. Not knowing at the time the receiver's appointment was made that I was effectively conscripting the receiver and his firm, I now find that the court has imposed on the professional friendship of

5. A substantial body of SEC injunction case law has been careful to identify the distinction between the management of a corporation and the corporate entity itself, when the circumstances of the corporation's continued existence have changed. *See, e.g., SEC v. Cenco, Inc.,* 436 F.Supp. 193, 199 (N.D.Ill.1977); *SEC v. American Beef Packers, Inc.,* [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,079, at 91,‑876 (D.Neb. May 4, 1977). Injunctive relief has not been considered necessary when adequate grounds exist for the conclusion that the individual misfeasants are no longer in a position to continue improper activity. *See, e.g., SEC v. Miller,* 495 F.Supp. 465, 483–84 (S.D.N.Y.1980); *SEC v. Penn Cent. Co.,* 425 F.Supp. 593, 597–98 (E.D.Pa.1976); *SEC v. National Student Mktg. Corp.,* 360 F.Supp. 284, 300 (D.D.C.1973); *SEC v. Franklin Atlas Corp.,* 171 F.Supp. 711, 718 (S.D.N.Y.1959).

JAT is simply the corporate shell of the entity previously involved in securities violations. It is difficult to conceive of a more complete corporate transformation. Moreover, the only individuals—Mr. Corey and those working under his control—identified as having engaged in prior securities violations are, by virtue of being addressees of Mr. Corey's injunction, no longer capable of misusing JAT to violate securities laws unless they violate an existing injunctive decree.

6. It was the reality of the legally fictive and essentially amoral character of the corporation which undoubtedly led Baron Thurlow to observe during a sentencing proceeding: "Did you ever expect a corporation to have a conscience, when it has no soul to be damned, and no body to be kicked?" *Quoted in* M. King, *Public Policy and the Corporation* 1 (1977). The basic insight, however, substantially predated Baron Thurlow. Professor King reports that it was "Pope Innocent IV who forbad the excommunication of corporations on the grounds that ... having neither minds nor souls [they] could not sin." *Id.* This papal position prompted Professor Coffee to identify Innocent IV as "the first legal realist" in the area of corporate law. Coffee, *"No Soul to Damn: No Body to Kick": An Unscandalized Inquiry into the Problem of Corporate Punishment,* 79 Mich.L.Rev. 386, 386 n. 2 (1981).

The flow of Anglo–Saxon corporate law from Coke to Denning has standfastly sought to avoid

what Professor Coffee terms "the anthropomorphic fallacy that the corporation was but an individual." *Id.; see, e.g., The Case of Sutton's Hospital,* 10 Co.Rep. 23a, 32b, 77 Eng.Rep. 960, 973 (K.B. 1612) (Coke, C.J.) (corporations "cannot commit treason, nor be outlawed, nor excommunicate, for they have no souls"); *British Steel Corp. v. Granada Television Ltd.,* [1981] 1 All E.R. 417, 439 (Ch. D., C.A. & H.L.1980) (Denning, M.R.) ("[I]n these courts, as in the United States, the privilege [against self-incrimination] is not available to a corporation. It has no body to be kicked or soul to be damned.") Indeed, affiliations with a corporation may actually deanthropomorphize individuals. *See Braswell v. United States,* — U.S. —, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988) (even sole shareholder of corporation acting as custodian of corporate records may not assert privilege against self-incrimination).

The Commission's efforts to introduce concepts of corporate contrition appear largely to find warrant in poetic license governing "aspects of the lawyer's world ... quite as amenable to a poet's use of words as to a lawyers [sic]." MacLeish, *Apologia,* 85 Harv.L.Rev. 1505, 1507 (1972). It is MacLeish's holding in *Corporate Entity* regarding the activities of the Oklahoma Ligno and Lithograph Co. which appears most supportive of the Commission's position:

> The Oklahoma Ligno and Lithograph Co
> Of Maine doing business in Delaware Tennessee
> Missouri Montana Ohio. and Idaho
> With a corporate existence distinct from that of the
> Secretary Treasurer President Directors or
> Majority stockholder being empowered to acquire
> As principal agent trustee licensee licensor
> Any or all in part or in parts or entire
> Etchings impressions engravings engravures prints
> Paintings oil-paintings canvases portraits vignettes
> Tableaux ceramics relievos insculptures tints
> Art-treasures or masterpieces complete or in sets
> The Oklahoma Ligno and Lithograph Co
> Weeps at a nude by Michel Angelo.

*Id.*

these appointees to obtain gratuitous services. While I quite agree with Judge Aldrich that true *amici curiae* are hard to find, *see Strasser v. Doorley,* 432 F.2d 567 (1st Cir.1970),[7] they have made their appearance here.

The customers of JAT have much reason to thank Mr. Blake and Arthur Young & Co. for their diligent, resourceful and effective work in making the customers whole. The receiver was ably guided by Mr. Whitlock, who committed the law firm of Palmer & Dodge to the single minded effort of protecting the investors. Ms. Moore made effective use of the support services of her firm, Goodwin, Procter & Hoar, in arguing successfully on behalf of an otherwise unrepresented entity against the idle judicial exercise of imposing a permanent injunction here.

It is no idle judicial exercise, however, to make clear, on behalf of the court and the customers of JAT, the gratitude due the receiver, his counsel, JAT's injunction counsel, and their respective firms for their exercise of the highest degree of professional responsibility in performing their roles *pro bono publico* in this case. Among other things, that exercise of professionalism has made clear that it is unnecessary to employ the drastic remedy of an injunction to be assured of full and fair relief in this case.

## IV

The Commission's request for a permanent injunction is DENIED. The Clerk is instructed to dismiss this action. A copy of this Memorandum shall be provided by the Clerk to each person identified as a creditor, employee, and account holder of John Adams Trust Corporation.

7. In *Strasser,* Judge Aldrich observed "that by the nature of things an amicus is not normally impartial," noting:

> As an attorney of our acquaintance once told the court, when asked for his response to the

argument of the amicus, "That fellow isn't any more a friend of the court than I am."
432 F.2d at 569 & n. 2.