UNITED STATES of America

v.

C.R. BARD, INC.

Cr. No. 93–10279–WF.

United States District Court,
D. Massachusetts.

April 8, 1994.

Richard Cooper, Eva M. Petko, Betsy K. Wanger, Gerald A. Feffer, Williams & Connolly, Washington, DC, Ralph D. Gants, Palmer & Dodge, Boston, MA, for defendant C.R. Bard, Inc.

Michael K. Loucks, U.S. Attys. Office, Boston, MA, for U.S.

MEMORANDUM AND ORDER

WOLF, District Judge.

*INTRODUCTION* [1]

There is in this case a binding plea agreement pursuant to Federal Rule of Criminal Procedure 11(e)(1)(C). The court is called upon to accept it, or reject it and give the defendant the opportunity to withdraw the

1. This Memorandum and Order is the slightly edited transcript of the statements made by the court in sentencing C.R. Bard, Inc. on April 5, 1994, to which citations and footnotes have been added.

plea. *See* Fed.R.Crim.P. 11(e)(3) and (4). I have decided to accept the plea agreement, and I will impose the sentence which it provides.

 The court has discretion with regard to whether to accept a plea agreement that is binding. It is obligated to exercise that discretion in a reasoned way. When, as here, the joint sentencing recommendation is the result of arms' length negotiations between capable counsel, this court believes the agreement should be accepted if it is reasonable. To put it another way, it should be accepted unless there is a good reason to reject it. *See United States v. Noble*, 653 F.2d 34, 36 (1st Cir.1981) (involving a Rule 11(e)(1)(A) charge bargain); *United States v. Ammidown*, 497 F.2d 615, 622 (D.C.Cir. 1973). This is particularly true if the plea will save substantial prosecutorial and judicial resources, and implicitly reflects the prosecutorial assessment that a plea by one defendant will strengthen the investigation and prosecution of other present or potential defendants. *See Ammidown*, 497 F.2d at 622; *United States v. Carrozza*, 807 F.Supp. 156, 159–60 (D.Mass.1992), *aff'd*, 4 F.3d 70 (1st Cir.1993).

Nevertheless, I have scrutinized the plea agreement to determine whether it is reasonable. In considering the reasonableness of the agreement, I have considered the facts, the terms of the plea agreement, and the Sentencing Guidelines, which do not apply because this conduct occurred before their effective date, but provide a point of reference to assess reasonableness. I have also considered the factors established by statute to be considered in imposing any sentence. *See* 18 U.S.C. § 3553(a)(2).

As I will describe in detail, I find that the agreed sentence would be within the Guidelines if the Guidelines were applicable. The sentence is also sufficient to satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). The sentence properly reflects the seriousness of the offense and serves the purposes of specific and general deterrence. It should forcefully send a message not only to Bard, but to other corporations and the individual human beings who act for them. It should also protect the public from further possible crimes by Bard, promote respect for the law, and provide just punishment for the offense. *Id.*

## FACTS

The essential facts of this case are as follows. C.R. Bard, Inc. has pled guilty to 391 felonies. These are one count of conspiracy, in violation of 18 U.S.C. § 371; 17 counts of mail fraud involving submissions to the Food and Drug Administration ("FDA)", in violation of 18 U.S.C. § 1341; eight counts of submitting false statements to the FDA, in violation of 18 U.S.C. § 1001; 363 counts of shipping adulterated medical devices, in violation of 21 U.S.C. § 333(a)(2), including 75 counts of shipping medical devices from an unapproved facility, 108 counts of shipping products that had been changed without the required FDA approval of that change, and 98 counts of shipping devices for human testing where such testing had not been approved; and two counts of failing to submit required reports to the FDA, in violation of 21 U.S.C. § 333(a)(2).

These are serious criminal violations. In essence, Bard knowingly and willfully kept adverse information from the FDA, made product changes that affected the safety or effectiveness of angioplasty catheters produced by its USCI Division without the required FDA approval, and illegally did testing on human beings without the required exemption from the FDA.

There were reports of product malfunction, injuries, and deaths associated with the catheters identified in the Information. Two patients died during or shortly after a medical procedure involving a Mini Profile angioplasty catheter during the time period charged in the Information; 50 patients had the tip of the Probe B catheter break off inside them during a catheterization procedure; and at least 17 patients had coronary bypass surgery following a Probe B tip break.

The court need not and will not make findings as to whether or not these deaths, or any injuries resulting from the tip breaks, were proximately caused by Bard's criminal violations. It is sufficient to recognize that these are the kinds of foreseeable conse-

quences that violations of laws designed to protect the public health and safety may have. The people at Bard who had responsibility for making products important to the care of seriously ill patients failed in their responsibility to comply with these laws.

It appears to this court that as a result of the subversion of the FDA process designed to assure that medical products are safe and effective, Bard made inherently risky procedures more dangerous. As Mrs. Linda Talbott eloquently explained,[2] patients must rely primarily on their doctors to decide if procedures are sufficiently safe to be warranted. Doctors, in turn, must rely on the FDA and the company for the information necessary to make such decisions on a properly informed basis. Bard's crimes deprived the FDA, doctors, and their patients of the benefit of crucial information. *See United States v. Dotterweich,* 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943). In doing so, Bard betrayed an important trust.

Each of the 391 criminal violations was committed intentionally. The false statement violations were committed knowingly and willfully. The mail fraud violations, the shipping violations, and the failure to submit required reports were done with the intent to defraud or mislead.

These were not isolated violations. They involved several Bard products, and extended over more than two years.

## THE PLEA AGREEMENT

The sentence to be imposed as a result of the plea agreement is $30,500,000 payable within 30 days as part of the civil settlement;[3] $15,250,000 payable in one year as part of the criminal fine; $15,250,000 payable within two years as the remainder of the criminal fine; and a $78,200 mandatory special assessment.

The plea agreement also provides, although it is not part of the sentence, that Bard will implement specified corporate remedial measures and keep them in effect for four years. Bard is also obliged to cooperate fully and truthfully in the investigation and prosecution of its present and former officers and employees. Six have been indicted, including the former Chairman of the Board and Chief Executive Officer, who has been removed from his position, but continues to be paid by Bard.

## THE PLEA AGREEMENT IS REASONABLE

■ There are a number of factors which together influence the court to conclude that the plea agreement is reasonable. First among these is the fact that the six individuals who allegedly acted for the defendant in conspiring to subvert the FDA process intended to assure the safety and effectiveness of inherently risky medical instruments are being prosecuted. I would not have accepted this plea without this provision.

Often, in my experience, companies will offer to plead guilty if the investigation or prosecution of its individual employees is dropped. I would have found that particularly inappropriate in this case. A corporation is a legal fiction. Individuals act for a

---

**2.** By Order dated March 7, 1994, the court granted a request to allow one member of the family of Eunice Beavers, a woman who had died during angioplasty involving a Bard catheter, to address the court at the sentencing hearing. Subsequently, two former employees of Bard who have been indicted in a related criminal case and are also defendants with Bard in a civil action brought by Mrs. Beavers' estate, filed a motion to preclude any member of the Beavers family from speaking at the sentencing hearing because of their concern that the resulting publicity would injure their ability to receive a fair trial in the civil and criminal cases. The court denied the motion because it found: (a) some information concerning the impact of Bard's conduct on possible victims should be part of the public record because the public has a legitimate interest in information necessary to evaluate the

reasonableness of the plea agreement and the court's decision to accept or reject it; and (b) " 'impartial jurors have been selected in many highly publicized [ ] cases by use of rigorous *voir dire* of the jury venire' and jurors chosen would be 'emphatically and clearly instructed to decide the case only on the evidence presented in court.' " *In re Globe,* 729 F.2d 47, 53 (1st Cir. 1984) (quoting *Colon Berrios v. Hernandez Agosto,* 716 F.2d 85, 92 (1st Cir.1983)). Accordingly, Mrs. Beavers' daughter, Linda Talbott, was allowed to address the court at the sentencing hearing.

**3.** The civil settlement relates to default claims and liability. It is not part of the criminal penalty.

corporation. Individuals commit crimes on behalf of a corporation. In this case, Bard's crimes have heightened risk to human life.

It is essential, in my view, that the law seek to hold individuals responsible for those crimes. They are properly presumed innocent. An individual's guilt will have to be proven beyond a reasonable doubt in a criminal case. It is, however, essential in a case like this, that individuals as well as corporations be the targets of criminal prosecution.

For, in a case like this, it is inadequate, and indeed somewhat frustrating, to seek to punish only a corporation. Sentences are, among other things, intended to address the defendant's conscience and influence future behavior. It is difficult to deal with what is essentially a legal abstraction in seeking to do that.

This is a fundamental and enduring problem. As my learned colleague, Judge Douglas Woodlock, had occasion to note in an opinion several years ago, when the Lord Chancellor of England sentenced a corporation centuries ago, he remarked: "Did you ever expect a corporation to have a conscience when it has no soul to be damned and no body to be kicked?" *Securities and Exchange Commission v. John Adams Trust,* 697 F.Supp. 573, 579 n. 6 (D.Mass.1988) (quoting Edward, First Baron Thurlow (1731–1806), as quoted in M. King, *Public Policy and the Corporation* 1 (1977)); *see also* J. Coffee, Jr., "No Soul to Damn: No Body to Kick: An Unscandalized Inquiry Into the Problem of Corporate Punishment," 79 *Mich.L.Rev.* 386 (1981).[4]

There is a poignant echo of Baron Thurlow's observation in the Presentence Report. Another of Mrs. Beavers' relatives, one of her adult granddaughters, wrote about her love for her grandmother and what she feels she and her family have been cheated of because of Mrs. Beavers' death. She ended her submission to the Probation Department by saying:

I know this probably won't mean anything to you, but while I have a chance to put in my two cents worth, just call it a healing thing, I would like to see those S.O.B.'s tried for murder. And I'm sure if the word was out, there are many, many more. But I know this is not possible, and their pocketbook is why this was done in the first place and that is the only thing that will hurt them. I hope you can kick their ass. Thank you for your time. I feel much better now.

In this case, the individuals allegedly responsible for Bard's crimes are being tried, not for murder, but for serious federal crimes, which could result in serious terms of imprisonment. Criminal prosecution of individuals in this case has the potential to provide a better sense of just punishment for the crimes committed. It also has the potential to send a message to corporate officials everywhere that crimes can have serious personal consequences and, therefore, to deter future criminal conduct.

This case shows that it is not appropriate to rely exclusively on corporations alone to send this message. In my view, various individual employees allegedly involved in these crimes have been treated generously by Bard. They have received substantial severance pay. The corporation's former Chief Executive Officer is still getting full pay. All are having their legal fees paid by Bard, with an undertaking to repay them if convicted, but it is doubtful if that will be possible.

I also note, however, that Bard is cooperating with the Government to the Government's full satisfaction in the prosecution of those individuals. That is a benefit of the plea agreement, as it increases the possibility that the individuals responsible for Bard's crimes will be held responsible for them.

The agreed sentence is also reasonable because Bard is paying a substantial penalty in the form of fines and debarment by the Defense Logistics Agency. While it is essential to the reasonableness of the plea agree-

---

**4.** Indeed, as Professor Coffee has noted, the dilemma presented in seeking to sentence a corporation was recognized well before Baron Thurlow's time. "In the thirteenth century Pope Innocent IV forbade the practice of excommunicating corporations on the unassailable logic that, since the corporation had no soul, it could not lose one. He thus became the first legal realist." 79 *Mich.L.Rev.* at 386 n. 2.

ment that individuals not be relieved of potential criminal responsibility, it would also in my view be unreasonable if only the individual employees had been charged and were subject to possible punishment. This would be especially true with regard to lower-level managers.

This is a case in which a pervasive and powerful corporate culture exalted the value of profit above the value of human life. The Presentence Report quoted one Bard engineer who wrote a memorandum during the time of these crimes. He apparently had qualms about them. He said in his memorandum to his colleagues:

> We never give our people enough time to accomplish their jobs but rather rush the program to the next step before it is ready. We feel enormous pressure from upper management and marketing to continue despite the unsolved technical issue.... We chose not to address these design flaws, but rather to begin production and fix these things on the way. We now find ourselves in the most uncomfortable position of trying to decide what to sell without adequate tests in place to identify the quality of our results ... Test protocol: how was this missed? Were we so with the program that we failed to anticipate that something could be wrong? Does asking tough questions or making waves put one in the political shithouse?

One would hope that there were human beings at Bard who had these qualms. Remarkably to me, and disturbingly, in this case there was no public whistle-blower. Evidently no one in the company felt he or she could go to anybody at Bard to attempt to stop the deliberate scheme to subvert the FDA process intended to assure the safety and effectiveness of its catheters. Indeed, when people raised these reservations, they were urged to abandon them, or at least to stop expressing them, with implicit threats that their jobs and the jobs of others could be jeopardized. It also appears that there

was a corporate culture in which nobody felt that he or she could publicly go to the FDA without a well-founded fear of retribution by Bard.

The trial of the individual defendants should determine which, if any, people are criminally responsible for the crimes which Bard admits were committed.[5] In the view of this court, however, the officers and directors of Bard during the relevant period are morally responsible for a corporate culture which placed potential profit above the value of human life.

This is particularly disturbing in this case, where the corporation made instruments to be used by doctors. Doctors in this country, acting in the Hippocratic tradition, have as a first principle of medical ethics, "Do no harm." Ideally, a company which makes medical instruments should be the institutional embodiment of a reverence for life. In this case, Bard exhibited an institutional ethic of greed and indifference to life.

Since it was greed that was the obvious motive for this culture, it is appropriate that Bard pay a substantial financial penalty. $61,000,000 in criminal fines and civil settlement is a substantial and reasonable penalty. The Government estimates that Bard derived gross sales (total revenues from all relevant catheters net of returns and recalls) of $61,-000,000 from its unlawful activities. The plea agreement provides for a criminal fine and civil settlement equal to the estimated gross sales.

I am satisfied that Bard's net profit from these illegal activities, although difficult to determine with precision, was well below that figure. As a result, this plea agreement does not merely require Bard to pay back the profit obtained from its misconduct, it requires Bard to pay the Government all of the estimated revenues it obtained from illegally marketed products, and it ensures that Bard will have lost far more from its conduct than it gained.

**5.** Bard has admitted there was a conspiracy of members of its corporate management to commit many federal felonies. The six individual defendants are, of course, each presumed innocent. It is possible that in their case the conspiracy to which Bard pled guilty, or each individual's membership in it, will not be proved beyond a reasonable doubt. There remains, therefore, the possibility that only the corporation will be held liable and punished for crimes it acknowledges some of its employees committed.

The $30,500,000 criminal fine appears to be within the fine range which would have been required if the Sentencing Guidelines were applicable. U.S.S.G. § 2F1.1; Government's Sentencing Memorandum at 14–16. This fine is more than three times higher than the next highest fine ever imposed in an FDA case. Government's Sentencing Memorandum at 7. In addition, Bard has been debarred by the Defense Logistic Agency, which should cost it income in the future. *Id.* at 10.

At the change of plea hearing, I expressed concern about whether the defendant could and would pay the $61,000,000 fine and civil settlement. Subsequent submissions and representations indicate that Bard has the capacity to pay the fine. I am satisfied that this is a real penalty, which the defendant can and will pay.

In assessing reasonableness, I have also been influenced by the fact that the plea agreement contains provisions for minimizing the risk that Bard will commit similar offenses in the future. The fine should discourage repetition of criminal conduct, but the plea agreement does not rely on the fine alone.

As contemplated by the Sentencing Guidelines, Bard is required by the plea agreement to reorganize in many ways to minimize the risk that its crimes will recur. *See* U.S.S.G. § 8B1.2 ("Remedial Orders"). Indeed, while I condemn Bard for its criminal conduct, I do credit it with having accepted responsibility for its past behavior, while not attempting to diminish, excuse or justify it, and with taking steps designed to prevent it from recurring. Among those steps are the implementation of a new corporate compliance program, the hiring of a new Vice President for Scientific Affairs with responsibility for medical and regulatory affairs company wide, the creation of a Regulatory Compliance Committee of the Board of Directors, the retention of an outside regulatory compliance consultant to inspect Bard each year and report his or her findings and suggestions to both Bard and the FDA, and the adoption of additional reporting obligations to the FDA.

In addition, the FDA will subject Bard products to especially intensive scrutiny under its Applications Integrity Policy. This means, among other things, that all time limits for the FDA to act on Bard's applications to test or market medical devices are suspended. This should assure that the FDA has the time to perform its functions properly, and does so.

As I discussed previously with counsel, the agreed sentence does not provide for restitution for victims. Although this is not the case in which to determine who has been victimized by Bard's conduct, it does appear that there are real human victims. The pleas of these perceived victims are eloquently expressed in their statements to the Probation Department. We heard one today from Mrs. Talbott.

Another example came to me from a man who lost his father. He wrote to the Probation Department, in part:

> The premature loss of my father, Francisco [ ], has caused our mother, Amalia, undue mental stress, emotional and physical stress. She has been forced from a secure lifestyle into an uncertain, stressful and complex existence. She has had to learn to manage property, budget for everyday living expenses, and be fearful for her retirement. She has had an added financial burden due to lack of insurance, steady income, and new responsibilities. She has suffered depression and loneliness since the death of the man she'd been married to for over 35 years. With her second grade education [and] Hispanic upbringing, she has been forced to learn a new way of life, and it has taken its toll.

The criminal sentence provided by the plea agreement does not provide restitution for the possible victims of Bard's crimes. In this case, however, that does not render the agreed-upon sentence unreasonable. Orders of restitution are discretionary. *See* 18 U.S.C. § 3663(a)(1). The court may decline to order restitution if the complication and prolongation of the sentencing process outweighs the need to provide restitution. *See* 18 U.S.C. § 3663(d). This is such a case.

It would be very time-consuming and complicated to litigate in this criminal case whether catheters involved in Bard's crimes

proximately caused injuries to numerous individuals. Much more importantly, at the end of that process, the court could only award victims compensation for their medical expenses and lost earnings. *See* 18 U.S.C. § 3663(b)(2). The court could not award damages for pain and suffering or punitive damages, which may be available in civil suits. Accordingly, individual civil suits are a much more appropriate means of addressing restitution, if the possible victims have notice of their possible claims.

Since the plea hearing I have been concerned that the plea agreement did not provide for notice to possible victims. There had been publicity and Bard had written to cardiologists, but I questioned whether this was sufficient to get essential information to people who may have been victimized by Bard's crimes. These concerns were heightened when the submissions revealed that the Beavers family was first informed by a newspaper report that a Bard catheter was used in the procedure during which Mrs. Beavers died.

However, since the plea there has been massive publicity which led to many calls to the United States Attorney's Office. In addition, the parties have assisted the Probation Department in an effort to notify possible victims of Bard's crimes, and the Beavers family would have been informed by that process had it not learned earlier of Bard's involvement.

Many possible victims have responded to the Probation Department. None have objected to the acceptance of the plea agreement or sentence.

In addition, Bard has agreed to the court's suggestion that a letter satisfactory to the court and the FDA, which has already been drafted and reviewed, be sent to cardiologists, explicitly explaining the crimes and the products involved.[6] The letter will ask doctors to send a copy to patients injured during angioplasty using a relevant Bard catheter, or to give Bard the information necessary to send the letter to the patients directly. If Bard gets that information, it will be shared with the United States Attorney's Office and the Probation Department.

This procedure should assure that possible victims receive adequate notice to decide if they have a claim they wish to assert in civil litigation. As I said, individual civil cases are much better than this criminal sentencing for the resolution of such claims.

*CONCLUSION*

For the foregoing reasons, the court finds that the agreed sentence provides just punishment for Bard. It should prevent Bard from committing comparable crimes in the future. It should also send a message to corporate officials and the companies they personify that to subvert the Food and Drug Administration process intended to assure the safety and effectiveness of medical products is not just wrong, it is dumb.

If they violate the law, they will be caught. Most of them will lose their jobs. They will be prosecuted personally and face the prospect of imprisonment. In addition, the companies that employ them will pay substantial financial penalties and, in the process, their crimes will receive widespread publicity.

If this message is received and taken seriously by other companies and those who personify them, perhaps this disturbing case will ultimately have some redeeming value.

*ORDER*

In connection with the 391 felonies to which Bard has pled guilty, I hereby impose the following sentence.[7]

6. As this case involves a binding Rule 11(e)(1)(C) plea agreement, the court could not order Bard to send this letter. However, recognizing the risk that the court would reject the plea agreement because of its reservations concerning the adequacy of notice to possible victims, Bard commendably undertook to send the letter.

7. On March 7, 1994, the court ordered that Bard's acting Chairman and Chief Executive Officer attend the sentencing hearing and invited other officials of Bard to attend. The acting Chairman and Chief Executive Officer appeared and addressed the court, unequivocally admitting, and expressing regret for, Bard's crimes. He stood as the representative of Bard as sentence was pronounced. In addition to counsel, he was accompanied by two executives of Bard and two "outside" members of its Board of Directors.

Bard shall pay criminal fines in the amount of $30,500,000, to be paid as follows. $15,250,000 shall be paid on or before April 5, 1995, and a second and final installment of $15,250,000 shall be paid on or before April 5, 1996. In accordance with the plea agreement, the specific sum of $30,500,000 includes interest.

In addition, Bard shall pay the Clerk of this Court a mandatory special assessment of $78,200, $200 for each of the 391 counts, not later than April 19, 1994.

Bard shall also pay the sum of $30,500,000 to the United States on or before May 5, 1994, in accordance with the terms of the civil settlement agreement.