### Linda TALBOTT, et al., Plaintiffs,

v.

### C.R. BARD, INC., David Prigmore and John Cvinar, Defendants.

### Civ. A. No. 94–10394.

United States District Court,
D. Massachusetts.

Aug. 23, 1994.

against the Bank's counterclaim, however, is not barred.

Jeffrey A. Newman, James Ponsetto, Jeffrey S. Beeler, Newman, Heineman & Itzkowitz, Boston, MA, for Linda Talbott, Judith K. Gastel.

Jeffrey A. Newman, Jeffrey S. Beeler, Newman, Heineman & Itzkowitz, Boston, MA, for Helen M. Wilson.

Francis C. Lynch, Daryl J. Lapp, Maria A. Patrizio, Palmer & Dodge, Boston, MA, for C.R. Bard, Inc.

Robert D. Keefe, Michael F. Zullas, Hale & Dorr, Boston, MA, for David W. Prigmore.

William H. Kettlewell, Dwyer & Collora, Boston, MA, for John Cvinar.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Eunice Beavers died after a heart catheter which was being used in a procedure intended to enhance her health and extend her life malfunctioned and allegedly caused her death. In a criminal case before this court, the manufacturer of the heart catheter, C.R. Bard, Inc. ("Bard"), pled guilty to charges that it conspired to defraud the United States Food and Drug Administration ("FDA") concerning a number of its various types of heart catheters, and to many claims of filing false statements with the FDA and shipping adulterated heart catheters. After accepting a binding plea agreement between Bard and the United States government, the court imposed on Bard criminal and civil fines totaling $61 million, and other penalties. *See United States v. C.R. Bard, Inc.*, 848 F.Supp. 287 (D.Mass.1994). In addition, six employees of Bard are now being prosecuted criminally.

This civil case, alleging wrongful death and other causes of action under state law, has been brought by Mrs. Beavers' heirs against Bard and two members of its management who are also defendants in the pending criminal case. Arguing that federal law preempts all of the state law claims in this case, the defendants moved to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted. A hearing on the motion to dismiss was held on August 5, 1994.

For the reasons set forth below, the court finds that all of the plaintiffs' claims are preempted. More specifically, the court finds that the relevant statute, 21 U.S.C. § 360k(a), expressly preempts all causes of action concerning the Bard heart catheter at issue here because the device was subject to comprehensive regulation by the FDA; there is no private right of action to enforce the FDA's standards; and permitting litigation of any of plaintiffs' state law claims would present the statutorily prohibited risk that Bard would be subject to requirements dif-

ferent than, or in addition to, the FDA requirements.

As applied in this case, the express preemption provided by 21 U.S.C. § 360k(a) manifests a decision by Congress to replace completely the private rights of action usually available under state law with civil and criminal enforcement by the federal government when thoroughly regulated devices, such as Bard's heart catheter, are at issue. This judgment represents a permissible decision by Congress that the public interest will best be served by relying exclusively on the FDA to strike the proper balance between reasonably assuring safety and promoting innovation with regard to new devices that have the potential both to enhance and to injure human health.

This is a particularly poignant case in which the heirs of a woman who died during angioplasty are being found not to have the right to seek compensation for the damages they have undoubtedly suffered. The government has vigorously enforced the applicable criminal and civil laws. Nevertheless, this decision may cause some, including those who enacted the law, to question whether complete preemption of private rights of action is the most fair and effective means of balancing the legitimate, competing interests of promoting innovation and reasonably assuring the safety of complex medical devices. It is axiomatic, however, that the courts must faithfully give effect to the intentions of Congress when they are clearly expressed by statute, as they have been in this case. Defendants' motion to dismiss, therefore, must be granted.

### I. *The Facts.*

■■■ In considering a motion to dismiss, a court must take all of the allegations set forth in the complaint as true and must draw every reasonable inference in favor of the plaintiff. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993); *Monahan v. Dorchester Counseling Center, Inc.*, 961 F.2d 987, 988 (1st Cir.1992). Plaintiffs' complaint, therefore, may not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

For purposes of resolving this motion to dismiss, the following alleged facts are accepted as true. The statements of the applicable law in this section are not in dispute.

Defendant C.R. Bard, Inc. is a New Jersey corporation. Plaintiffs' Second Amended Complaint ("Second Am. Compl.") ¶ 3. Its USCI Division maintains offices and manufacturing facilities in Massachusetts. *Id.* Defendant David Prigmore, a citizen of Massachusetts, was the Group Executive Vice President in charge of Bard's USCI Division. *Id.* ¶ 1. Defendant John Cvinar, also a citizen of Massachusetts, was President of the USCI Division. *Id.* ¶ 2.

Eunice Beavers was a citizen of Missouri, where she died on December 28, 1988. Plaintiff Linda Talbott, a daughter of Mrs. Beavers, is the Administratrix of the Estate of Eunice Beavers and is a citizen of Missouri. *Id.* ¶ 4. Plaintiffs Judith K. Gastel and Helen Marie Wilson are also daughters of Eunice Beavers, and citizens of Missouri. *Id.* ¶¶ 5–6.

In 1980 Bard, through its USCI Division, began to distribute a Swiss heart catheter known as the Gruentzig dilation catheter. *Id.* ¶ 9. Under federal law, the manufacturer of a heart catheter must demonstrate to the FDA that there is reasonable assurance that its device is safe and effective for human use prior to its distribution. 21 U.S.C. §§ 360c(a)(1)(C); 360e. The distribution of any heart dilation catheter incorporating new designs, materials, or manufacturing changes that affect the safety or the effectiveness of the device requires FDA approval of a premarket approval supplement. 21 U.S.C. § 360e(f); 21 C.F.R. § 814.39. Clinical human testing of an unapproved medical device cannot be performed without FDA authorization granting an Investigational Device Exception ("IDE"). 21 U.S.C. § 360j(g). Federal law requires that manufacturers promptly notify the FDA of any deaths, serious injuries, or certain malfunctions experienced during, or as a result of, the use of heart

catheters. 21 U.S.C. § 360i(a); 21 C.F.R. § 803.1(a)(2).

Plaintiffs allege from about 1987 through about 1990, certain individuals within both Bard and its USCI Division began willfully to ignore FDA notification and approval requirements established to ensure the safety and effectiveness of heart catheters by, among other things, failing to report that Mini Profile catheters were experiencing balloon deflation malfunctions while inside patients' coronary arteries. Second Am.Compl. ¶¶ 17–18. Plaintiffs further allege that the defendants, beginning in about 1987, distributed for experimental testing and full scale distribution redesigned versions of its heart catheters without the required FDA approval. *Id.* ¶ 19. Plaintiffs do not allege, however, that a redesigned catheter was used in the angioplasty procedure during which Mrs. Beavers died.

Plaintiffs allege that in about February 1988 Bard knew that its Mini Profile catheters, manufactured by its USCI Division, had a propensity to fail to deflate in patients' coronary arteries, and that this malfunction could result in death. *Id.* ¶¶ 24–25. On about March 8, 1988, Bard filed allegedly fraudulent, misleading and inaccurate documentation with the FDA seeking approval to distribute for human use the Mini Profile catheter. *Id.* ¶ 26.

The FDA approved distribution of the three lumen[1] Mini Profile catheter on May 24, 1988. Second Am.Compl., Ex. A, at 31, ¶ 70. From July 1988 through about November 1988, Bard received at least twenty-eight complaints from physicians and others that Mini Profile catheters were failing during use, but Bard did not notify the FDA or recall the product. *Id.* ¶¶ 28–30. Rather, allegedly in response to the deflation problem, Bard redesigned its heart catheters and sold them without FDA approval. *Id.* ¶ 31. The redesigned catheters had two, rather than three, tubes. *Id.*, Ex. A, at 33, ¶ 77.

On December 28, 1988, Eunice Beavers underwent a percutaneous transluminal coronary angioplasty procedure with a Mini Profile catheter which failed to deflate, allegedly causing Mrs. Beavers' death. *Id.* ¶¶ 31–32. The catheter used was the FDA approved Bard three lumen Mini Profile. *Id.*, Ex. A, at 34, ¶ 82.

On or about January 19, 1989, Bard filed a Medical Device Report notifying the FDA that Eunice Beavers had died while undergoing angioplasty with a Mini Profile catheter. *Id.* at 34. Plaintiffs allege Bard falsely and fraudulently stated in the Report that whether the incidence of faulty deflation was occurring with greater frequency or severity than described on the device's labelling was "unknown." *Id.*

On February 15, 1990, the FDA ordered a recall of the Mini Profile catheter. *Id.* ¶ 41.

At no time did the defendants notify Eunice Beavers' family or physicians of the Mini Profile's deflation problems. *Id.* ¶ 36. It was not until about November 1993, when survivors of Eunice Beavers were contacted by a newspaper reporter in connection with the criminal case against Bard, that Mrs. Beavers' family learned that the Mini Profile catheter was used in the procedure which resulted in her death, and was implicated in the criminal prosecutions and FDA civil case against Bard and its employees. Second Am. Compl. ¶¶ 37–38.

In the criminal case, Bard pled guilty to one count of conspiracy; seventeen counts of mail fraud involving false submissions to the FDA; eight counts of submitting false statements to the FDA; two counts of failing to submit required reports to the FDA; and 363 counts of shipping adulterated medical devices, including 75 counts of shipping medical devices from an unapproved facility, 108 counts of shipping products that had been changed without the required FDA approval of that change, and 98 counts of shipping devices for human testing where such testing had not been approved. *See C.R. Bard,* 848 F.Supp. at 288.

Pursuant to the binding plea agreement which the court found to be acceptable, the court imposed on Bard a criminal fine of $31,000,000 and a civil fine of an additional $31,000,000; required that Bard institute oversight procedures to prevent the recur-

---

1. As used by Bard in connection with its heart catheters, a "lumen" is a tube.

rence of violations of the FDA laws; and required Bard to provide notice to the class of possible victims and litigants. *Id.* at 293.

Prigmore and Cvinar are defendants in the criminal case against six Bard employees, which is still pending. The prosecution of the individual employees of Bard was a significant factor in the court's decision to find the binding plea agreement to be reasonable and acceptable. *C.R. Bard,* 848 F.Supp. at 289–90. Indeed, the court stated it would not have accepted the corporation's binding plea agreement if the individuals alleged to be responsible for its misconduct were not also being prosecuted. *Id.*

Plaintiff in this proceeding, Linda Talbott, addressed the court at Bard's sentencing hearing. *Id.* at 289 n. 2. The court noted it was not then making any findings as to whether Bard's criminal violations had proximately caused any deaths or injuries, *id.* at 288, including the death of Mrs. Beavers. The court did recognize, however, that death is the kind of foreseeable consequence that violations of laws designed to protect the public health and safety may have. *Id.*

This litigation began in the Middlesex Superior Court of the Commonwealth of Massachusetts. Bard removed the case to this court. Plaintiffs, in their Second Amended Complaint, allege twenty counts against the defendants, including claims of negligence; gross negligence; fraudulent concealment; fraudulent misrepresentation; breach of express and implied warranties; negligent hiring, training, retention and supervision; battery; civil conspiracy; and violations of the Massachusetts unfair practices law, Mass. Gen.L. ch. 93A. Plaintiffs also assert claims of negligent infliction of emotional distress on the members of Mrs. Beavers' family as a result of her death. They seek punitive as well as compensatory damages.

Plaintiffs contend that Massachusetts law governs these claims. Defendants argue that Missouri provides the applicable state law. However, because the court finds that all of plaintiffs' claims are preempted by federal law, the choice of law issue is moot.

## II. *Analysis.*

### A. *The Medical Device Regulatory Scheme.*

The three lumen Mini Profile catheter which was used in the procedure that resulted in Mrs. Beavers' death is subject to the regulatory scheme established by the Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 360c, *et seq.*, to the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 360, *et seq.*, and the related regulations promulgated by the FDA, 21 C.F.R. § 800, *et seq.* The Court of Appeals for the First Circuit has said that the MDA "reflects Congress' balancing the need for regulation to protect public health against its interest in allowing new and improved devices to be marketed expeditiously without the costs attributable to an excess of regulation." *Mendes v. Medtronic, Inc.,* 18 F.3d 13, 14 (1st Cir.1994).

Under the MDA, medical devices are classified into one of three ascending categories, Class I, Class II, or Class III, "based on the degree of regulation necessary to assure safety and effectiveness." *Mendes,* 18 F.3d at 14; *see also* 21 U.S.C. § 360c. "All classes of devices are subject to 'general controls,' including labeling requirements and good manufacturing practices. *See, e.g.,* 21 U.S.C. §§ 360i, 360j." *Mendes,* 18 F.3d at 14.

"Class I devices generally pose little or no threat to public health and safety; tongue depressors are an example." *Stamps v. Collagen Corp.,* 984 F.2d 1416, 1418 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993). Therefore, Class I devices are only subject to the general controls. 21 U.S.C. § 360c(a)(1)(A).

Class II devices, such as tampons and oxygen masks used in anesthesiology, are more complex. "These may be subject to recommendations, guidelines, post-marketing surveillance, the development of patient registries, and even the promulgation of specific performance standards, should the FDA deem them a sufficient health hazard as to require strict product specifications or warnings." *Stamps,* 984 F.2d at 1418; *see also* 21 U.S.C. § 360c(a)(1)(B).

A Class III device is one which is "represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health," or which "presents an unreasonable risk of illness or injury" and as to which there is insufficient information for the FDA to conclude that merely meeting Class I or Class II requirements "will provide reasonable assurances of its safety and effectiveness." 21 U.S.C. § 360c(a)(1)(C). Class III devices are subject to premarket approval ("PMA") and post-approval regulation to keep the FDA informed of developing information on the device as it becomes available and, in this fashion, to provide reasonable assurances of the device's safety and effectiveness. *See* 21 U.S.C. §§ 360c(a)(1)(C), 360e(e), 360i(a).[2]

The PMA process for a Class III device requires that the manufacturer submit to the FDA detailed information concerning the device's design, components, properties and the principles of its operation; its manufacture, processing, packaging and installation; its performance standards, if any; samples of the device; samples of the proposed labeling; and any other information deemed relevant by the FDA. 21 U.S.C. § 360e(c); 21 C.F.R. § 814.20. Each application is referred by the FDA to a panel of experts, 21 U.S.C. § 360e(c)(2), and the FDA may either approve the device for sale or return the application for additional information or testing. 21 U.S.C. § 360e(d). Approval is granted if the FDA finds that there is a "reasonable assurance" that the device is "safe and effective," "weighing any probable benefit to health from the device against any probable risk of illness or injury from such use." 21 U.S.C. § 360c(a)(2); 21 C.F.R. § 860.7. Once the device has been approved for sale, the manufacturer must maintain certain records and report to the FDA regarding the device. 21 U.S.C. § 360i.

As acknowledged by the parties at the August 5, 1994, hearing, the Mini Profile catheter at issue here is a Class III device which had been subject to the previously described PMA process and approved by the FDA.[3] More specifically, in March 1988 Bard sought approval for the Mini Profile catheter in PMA Supplement 20 to the Gruentzig PMA. Second Am.Compl., Ex. A, at 31, ¶¶ 69–70. As indicated earlier, on May 24, 1988, the FDA approved distribution of the three lumen Mini Profile catheter which was used in Mrs. Beavers' fatal angioplasty procedure. *Id.* at 31, 34, ¶¶ 70, 82.

### B. *Preemption.*

■■■ The Constitution and laws of the United States are "the supreme Law of the Land" and, therefore, may preempt state law. U.S. Const. art. VI, cl. 2; *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992); *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819). Congressional purpose is the key to determining questions of preemption. *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2617. In view of the historic importance of federalism in these areas, the states' police powers relating to public health and safety are not preempted by federal law unless that is Congress' clear and manifest purpose. *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2617. Moreover, where, as in the instant case, Congress has included an express preemption provision in a statute, a court may not look beyond it to consider implied preemption. Rather, "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2618; *Mendes,* 18 F.3d at 16; *King v. Collagen Corp.,* 983 F.2d 1130, 1139 (1st Cir.), *cert.*

---

**2.** There are two exceptions to the PMA requirement for Class III devices: (1) devices which the FDA finds to be "substantially equivalent" to devices on the market before the MDA became effective in 1976 may bypass the PMA process unless or until the FDA orders compliance, 21 U.S.C. § 360e(b)(1); and (2) devices that obtain an IDE from the FDA, 21 U.S.C. § 360j(g), may be clinically tested on humans without being subject to the PMA procedure. 21 U.S.C.

§ 360e(a). Neither exception was applicable to the Bard Mini Profile catheter.

**3.** The catheter was also treated as a Class III device in the criminal case against Bard. *See e.g.,* Second Am. Compl., Ex. A at 62, ¶ 122 (redesigned Mini Profile catheters are Class III devices).

*denied*, —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993).

The preemption provision of the MDA provides in pertinent part that:

[N]o state or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under [the FDCA] to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under [the FDCA].

21 U.S.C. § 360k(a).[4] State common law claims may establish state "requirements" and are, therefore, subject to preemption under § 360k(a). *Mendes*, 18 F.3d at 16; *King*, 983 F.2d at 1138; *Stamps*, 984 F.2d at 1420; 21 C.F.R. § 808.1(b).

"Congress's intent in enacting this [preemption] provision was to prevent state requirements from unduly burdening interstate commerce." *Mendes*, 18 F.3d at 16. Judge Juan Torruella's opinion for the Court of Appeals for the First Circuit in *King* characterized § 360k(a) preemption as "broad, but limited." 983 F.2d at 1134. In their concurrence in *King*, Judges Bailey Aldrich and Levin Campbell stated that they interpreted § 360k(a) as providing "maximum protection and express preemption, leaving no need to seek implications." *Id.* at 1139.

■ The FDA has interpreted the MDA's preemption clause in its regulations. As the agency charged with administering the MDA, the FDA's reasonable construction of that law is controlling if it is not contrary to congressional intent. *See, e.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). One relevant FDA regulation provides that:

State or local requirements are preempted only when the [FDA] has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby

making any existing divergent state or local requirements applicable to the device different from, or in addition to, the specific [FDA] requirements.

21 C.F.R. § 808.1(d). The Court of Appeals for the First Circuit has found that the PMA process constitutes a "specific requirement" within the meaning of 21 C.F.R. § 808.1(d) and, therefore, 21 U.S.C. § 360k(a) is operative with regard to Class III devices. *King*, 983 F.2d at 1134; *see also Mendes*, 18 F.3d at 17 (regulations pertaining to labeling and good manufacturing practices for Class III devices are requirements under MDA triggering preemption); *Stamps*, 984 F.2d at 1422 n. 3 (PMA process is specific requirement); *Slater v. Optical Radiation Corp.,* 961 F.2d 1330, 1333 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 327, 121 L.Ed.2d 246 (1992) (procedural requirements of MDA have same preemptive effect as substantive requirements); *Bravman v. Baxter Healthcare Corp.,* 842 F.Supp. 747, 760–61 (S.D.N.Y.1994) (following *King* and *Stamps*); *English v. Mentor Corp.,* No. CIV.A. 93–2725, 1994 WL 263353, *3 (E.D.Pa. June 13, 1994) (PMA process is requirement within meaning of 21 C.F.R. § 808.1(d)); *Michael v. Shiley, Inc.,* No. CIV.A 93–1729, 1994 WL 59349, *7 (E.D.Pa. Feb. 25, 1994) (same). *Contra Oja v. Howmedica, Inc.,* 848 F.Supp. 905, 906–07 (D.Colo.1994) (explicitly rejecting Court of Appeals for the First Circuit's ruling in *Mendes* that MDA's general controls were specific requirements triggering preemption).

■ Under First Circuit law, claims which if successfully litigated "would establish or perpetuate any requirements under the common law differing from or adding to the [MDA's] requirements" are preempted. 21 U.S.C. § 360k(a); *Mendes*, 18 F.3d at 17; *King*, 983 F.2d at 1134–35; *see also Gile v. Optical Radiation Corp.,* 22 F.3d 540, 542 (3d Cir.1994); *Stamps*, 984 F.2d at 1423–24 (5th Cir.); *Slater*, 961 F.2d at 1336 (7th Cir.).

As a Class III device, the three lumen Mini Profile catheter at issue in this case was regulated by the FDA in virtually every re-

---

**4.** As discussed at footnote 8 *infra* and accompanying text, subsection (b) of § 360k permits a

state to petition the FDA for exemptions from preemption pursuant to subsection (a).

spect, including design, manufacturing, labeling, and distribution. 21 U.S.C. § 360e(c)(1). In cases involving other Class III products, the preemptive effect of § 360k(a) has been held by the Court of Appeals for the First Circuit to extend to almost all of the claims alleged here, including negligence in manufacture and distribution, breach of express and implied warranties, failure to warn, and strict liability. *See King*, 983 F.2d at 1135–36; *Mendes*, 18 F.3d at 18–19.

■ Plaintiffs seek to distinguish *King* and *Mendes* by asserting that the MDA does not preempt state law in this case because defendants fraudulently withheld information from the FDA both before and after obtaining PMA approval for the Mini Profile catheter. This court finds, however, that Congress did not intend to establish a fraud on the FDA exception to the express preemption established by § 360k(a) of the MDA. In reaching this decision, the court is guided, although not governed, by the concurring opinion of Judges Aldrich and Campbell in *King*, 983 F.2d at 1139–40.[5]

In *King*, the plaintiff alleged that the manufacturer of a Class III product concealed its dangerous properties and fraudulently obtained FDA approval for its sale. 983 F.2d at 1132, 1136. Judge Torruella, writing for the Court of Appeals, concluded that such allegations of risk concealment are "at bottom, a failure to warn claim." *Id.* at 1136. Thus, he found them to be preempted by the FDA packaging and labeling requirements. *Id.* Judge Torruella reasoned that a meritorious claim of fraud would require a finding that the defendant had a duty to provide information in its packaging and labeling different from that approved by the FDA and, therefore, the claim was expressly preempted. *Id.*

In their concurrence in *King*, Judges Aldrich and Campbell also addressed the fraud on the FDA claim presented here and rejected plaintiffs' contention that such misconduct modifies the effect of the express preemption provision of the MDA. *Id.* at 1139–40. In explaining their conclusion, the concurring Court of Appeals judges wrote:

> To prove fraud [on the FDA], plaintiffs must show causality. Surely, where the FDA was authorized to render the expert decision on [a product's] use and labeling, it, not some jury or judge, is best suited to determine the factual issues and what their effect would have been on its original conclusions. Further, if the court erred, and incorrectly posited the effect on the FDA's use and labeling decision, this would impose a state requirement "which is different from, or in addition to, any requirement applicable ... to the device." 21 U.S.C. § 360k(a).

*Id.*

As Judges Aldrich and Campbell also observed, permitting private litigants to maintain civil actions based on claims of fraud on the FDA would run "afoul of the general principle against implying personal causes of action." *Id.* This conclusion is consistent with the decisions in many cases finding that there is no private right of action under the FDCA. *See Mendes*, 18 F.3d at 19 n. 4; *Rodriguez v. SK & F, Co.*, 833 F.2d 8, 9 (1st Cir.1987) (per curiam); *Gile*, 22 F.3d at 544; *Pacific Trading Co. v. Wilson & Co.*, 547 F.2d 367, 370 (7th Cir.1976); *Kemp*, 835 F.Supp. at 1022 n. 5; *Hunsaker v. Surgidev Corp.*, 818 F.Supp. 744, 754 (M.D.Pa.1992), *aff'd*, 5 F.3d 1489 (3rd Cir.1993); *National Women's Health Network Inc. v. A.H. Robins Co., Inc.*, 545 F.Supp. 1177, 1180 (D.Mass.1982).

Nevertheless, this court has considered whether it would be proper to find that there

---

**5.** Following the decision in *King*, the Court of Appeals for the First Circuit in *Mendes* "express[ed] no opinion on whether products liability claims are preempted only if the manufacturer complied with applicable FDA regulations" because that issue was not presented by the facts of that case. 18 F.3d at 19–20. Accordingly, it appears that the Court of Appeals for the First Circuit does not construe the concurrence in *King* to have decided this issue. Thus, this court

does not regard itself as necessarily bound by the law as interpreted by Judges Aldrich and Campbell in their concurrence in *King*. This court, however, agrees with the other district courts which have found their analysis to be correct. *See Griffin v. Medtronic*, 840 F.Supp. 396, 397 (D.Md.1994); *Kemp v. Pfizer*, 835 F.Supp. 1015, 1021–22 (E.D.Mich.1993); *Michael*, 1994 WL 59349, *9–10.

is a private cause of action established by Massachusetts (or Missouri) law for negligence or breach of an implied warranty which is not preempted if the court instructed the jury that the defendants' obligation was to meet the standards established by the MDA and related FDA regulations, and properly defined those standards. This possibility, however, was implicitly rejected by Judges Aldrich and Campbell in their concurrence in *King*, 983 F.2d at 1139–40, and subsequently expressly rejected by the Court of Appeals for the First Circuit in *Mendes*, 18 F.3d at 19, n. 4. More specifically, in *Mendes*, the Court of Appeals for the First Circuit stated:

> One way to ensure that a factfinder applies a standard not adding to or differing from FDA regulations is to supplant the common law standard with FDA's requirements. We find nothing to support that Congress intended such a radical, unwieldy form of preemption, however, particularly where Congress did not intend to create a private right of action under the Federal Food, Drug, and Cosmetic Act.

*Id.*

In reaching this decision, the Court of Appeals for the First Circuit rejected the reasoning and result of a case on which plaintiffs here rely, *Hurley v. Lederle Laboratories Division of American Cyanamid Co.*, 863 F.2d 1173, 1179–80 (5th Cir.1988). In *Hurley*, the Court of Appeals for the Fifth Circuit treated the question of whether state law claims concerning a FDA approved vaccine could be maintained as an issue of implied preemption rather than express preemption. *Id.* at 1176–80. Properly recognizing that courts should be reluctant to find that federal law *implicitly* preempts state law, the Court of Appeals for the Fifth Circuit declined to infer that intention.[6] *Id.* at 1177. Acknowledging, however, that claims based on duties to warn created by state law had the potential to establish liability for manufacturers which had complied with FDA regulations, the Court of Appeals for the Fifth Circuit held that:

> [T]he only question that can be presented to the jury consistent with the federal regulatory scheme is whether the manufacturer withheld, either at the time the FDA decided the content of the warning, or since then, information that would have changed the FDA's decision. We believe that this issue should be presented to the jury in the form of special interrogatories, questioning whether and what information the manufacturer withheld from the FDA, if any, and whether possession of this information would have materially altered the content of the FDA's warning.

*Id.* at 1179–80; *see also Bravman*, 842 F.Supp. at 760 n. 20.

In their concurrence in *King*, Judges Aldrich and Campbell stated that they disagreed with *Hurley* and instead agreed with the Court of Appeals for the Eleventh Circuit which had rejected the reasoning of *Hurley* on the issue of preemption in the context of interpreting another statute in *Papas v. Upjohn Co.*, 926 F.2d 1019, 1026 n. 8 (11th Cir.1991), *vacated and remanded*, —— U.S. ——, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992),

---

**6.** It is the distinction between implied preemption and express preemption which makes plaintiffs' reliance on *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 251, 104 S.Ct. 615, 623, 78 L.Ed.2d 443 (1984), misplaced. In *Silkwood*, the Supreme Court did state that "[i]t is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Id. Silkwood*, however, was a case of implied preemption rather than express preemption. *Id.* at 249, 104 S.Ct. at 621; *Stamps*, 984 F.2d at 1425 n. 10 (characterizing *Silkwood* as "refusing to recognize ... preemption ... based upon implied 'conflict' or 'frustration' preemption"). The Supreme Court's unwillingness in *Silkwood* to impute to Congress an intention to take the extraordinary step of eliminating private rights of action without a clear statement of that intention in the statute is consistent with the views it later expressed in *Cipollone* that the states' police powers relating to public health and safety are not preempted by federal law unless that is Congress' clear and manifest purpose, —— U.S. at ——, 112 S.Ct. at 2617, and that "Congress' enactment of a provision [expressly] defining the preemptive reach of a statute implies that matters beyond that reach are not pre-empted," *id.* at ——, 112 S.Ct. at 2618. As stated earlier, this court has recognized and applied these important principles in deciding this case. However, where, as here, the statute contains an express preemption provision, the court must interpret and apply it in a manner which gives effect to the manifest intentions of Congress.

*reinstated and aff'd,* 985 F.2d 516 (11th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993). *King,* 983 F.2d at 1140. Subsequently, the Court of Appeals for the First Circuit in *Mendes* concurred with Judges Aldrich and Campbell in their rejection of *Hurley,* 18 F.3d at 19 n. 4.

██ The conclusion that there is not a fraud on the FDA exception to the scope of the MDA's preemptive effect is not qualified in a case in which the FDA has recalled a device or, indeed, already established that a manufacturer fraudulently obtained or retained FDA authorization to distribute it. *Kemp,* 835 F.Supp. at 1023. The parties dispute whether Bard admitted fraud on the FDA concerning the three lumen Mini Profile catheter used in Mrs. Beavers' angioplasty in connection with its guilty plea in the criminal case. There is some ambiguity concerning this question. It is, however, not now necessary to resolve this issue. As noted earlier, it is axiomatic that for the purposes of deciding a motion to dismiss, the court must assume that the facts alleged by the plaintiffs, including those concerning their claims of fraud on the FDA, are true. *Watterson,* 987 F.2d at 3. However, there is no private right of action to enforce the standards of FDA. *See, e.g., Mendes,* 18 F.3d at 19 n. 4. Therefore, a private plaintiff lacks the capacity to litigate even plainly meritorious claims that the FDA has been defrauded. Rather, it is the sole right and responsibility of the FDA and other agencies of the United States government to assert such claims, as they have done in obtaining the assessment against Bard of $31,000,000 in civil fines and an additional $31,000,000 in criminal fines for its misconduct concerning its heart catheters. *See* 21 U.S.C. § 360h (describing remedial steps open to FDA for violations of the FDCA).

As a practical matter, if Congress intended to establish a fraud on the FDA exception to the preemption it provided for state law claims concerning Class III devices, which are comprehensively regulated by the FDA, it would have seriously threatened the balance it sought to establish between promoting innovation and protecting human health. If a fraud on the FDA exception exists, it is foreseeable that it would often be alleged to apply in MDA cases. Initially, those allegations would have to be accepted as true. At a minimum, such cases would require extensive and expensive discovery. Many of them might survive motions for summary judgment and have to be tried. Thus, as the court wrote in *Kemp:* "Were the court to decide that an allegation of fraud on an agency would save all tort claims against Class III devices, then the provisions of the MDA and the intent of Congress would be rendered a nullity." 835 F.Supp. at 1021; *see also Michael,* 1994 WL 59349, *10.

Congress could reasonably decide that when the FDA has already established it was defrauded, private rights of action to recover damages on behalf of injured individuals are appropriate. Where, as here, it is well-established that there is generally no private right of action to enforce the MDA, if Congress intends to create an exception for fraud which has already been demonstrated by the FDA, it should say so clearly. In view of the unqualified language of the MDA's present preemption provision, however, this court does not have a proper basis for inferring that such an exception was intended.

The absence of a fraud on the FDA exception to § 360k(a) preemption in cases involving Class III medical devices which have been subject to a PMA does not mean that individuals injured as a result of such fraud will always be deprived of any compensation for their injuries. Sentences in criminal cases may include orders of restitution to victims. *See* 18 U.S.C. § 3663(a)(1); *C.R. Bard,* 848 F.Supp. at 292–93. In the criminal case against Bard, the court did not reject the binding plea agreement for failing to provide for restitution because it found that the complication and prolongation of the sentencing process that would be involved outweighed the need to provide restitution as part of the sentence. *C.R. Bard,* 848 F.Supp. at 292–93. This conclusion was based, in part, on the fact that restitution in criminal cases may not include compensation for pain and suffering and punitive damages, *see* 18 U.S.C. § 3663(b)(2), and the belief that civil actions were more appropriate proceedings for litigating whether Bard heart catheters

proximately caused distinct injuries to numerous individuals. *C.R. Bard,* 848 F.Supp. at 292–93. The court now realizes that its analysis was mistaken to the extent that it did not then recognize that victims' rights to assert civil claims concerning Bard's heart catheters are preempted by the MDA. Nevertheless, the federal criminal law does generally provide a means of furnishing some compensation to some individuals injured by Class III medical devices approved as a result of a manufacturer's fraud on the FDA.[7]

■ Contrary to plaintiffs' contention, the absence of a fraud exception to the express preemption provision of the MDA does not have the effect of nullifying any provision of that statute, including 21 U.S.C. § 360h(d). It is true that a statute should be construed, whenever possible, to give effect to all of its provisions. *See, e.g., United States v. DeLuca,* 17 F.3d 6, 10 (1st Cir.1994); *Lamore v. Ives,* 977 F.2d 713, 716–17 (1st Cir.1992). This court's analysis does not, however, violate that canon of construction.

As plaintiffs note, 21 U.S.C. § 360h(d) states that:

> *Effect on other liability.* Compliance with an order issued under this section shall not relieve any person from liability under Federal or State law. In awarding damages for economic loss in an action brought for the enforcement of any such liability, the value to the plaintiff in such action of any remedy provided him under such order shall be taken into account.

This provision plainly contemplates that a manufacturer may in some circumstances be liable under state law for devices subject to FDA regulation pursuant to the MDA. This court's conclusion that federal law preempts state law claims concerning Class III medical devices which have been subject to a PMA, such as the three lumen Mini Profile cathe-

ters at issue in this case, does not, however, render 21 U.S.C. § 360h(d) ineffective.

Section 360h(d) is generally applicable to Class I and II devices, as well as Class III devices. As described earlier, Class I devices, such as tongue depressors and crutches, are subject only to general controls. Class II devices, such as tampons and oxygen masks used in anesthesiology, are subject to broader controls than Class I devices, but there are areas concerning them left open to state regulation. Thus, 21 U.S.C. § 360k(a) does not preempt state law in cases involving Class I or II products as fully as it preempts state law in cases involving Class III devices subject to comprehensive FDA regulation. *See, e.g., Moore v. Kimberly Clark,* 867 F.2d 243, 246 (5th Cir.1989) (design defect claims are not preempted by requirements applicable to tampons, which are Class II devices not subject to PMA); *Brown v. Medtronic, Inc.,* 852 F.Supp. 717, 721 (S.D.Ind.1994) ("[T]he general regulations for Class II devices do not rise to the level to cause preemption under the MDA."); *Elbert v. Howmedica, Inc.,* 841 F.Supp. 327, 330–31 (D.Haw.1993) (Class II knee prosthesis device not subject to design specifications, so state law claim of design defect is not preempted); *Parenteau v. Johnson Orthopedics, Inc.,* No. CIV. 93–521–SD, 1994 WL 288932, *4 (D.N.H. June 29, 1994) (same).

In addition, as noted earlier, *see* footnote 4, *supra,* the MDA permits a state to apply for and receive an exemption from the preemption caused by operation of 21 U.S.C. § 360k(a). *See* 21 U.S.C. § 360k(b).[8] Section 360h(d), which provides that compliance with an FDA order does not relieve a manufacturer from liability under state law, would operate with regard to any Class I, II, or III device for which an exemption had been obtained. No such exemption is applicable in the present case. Nevertheless, there are

---

7. If Cvinar and Prigmore are convicted in the criminal case still pending against them, the plaintiffs here could attempt to obtain restitution, pursuant to 18 U.S.C. § 3663, as part of their sentences. Such a request, however, may be barred by § 3663(a)(2), which defines a "victim" as "any person *directly* harmed by the defendant's criminal conduct." (emphasis added).

8. 21 U.S.C. § 360k(b) provides that upon the application of a state, the FDA may by regulation exempt from the preemptive effect of § 360k(a) a state requirement if that requirement is more stringent than the federal standard, or if the requirement is necessitated by compelling local conditions and compliance with the state standard would not cause the device to violate any applicable FDA requirement.

plainly circumstances in which 21 U.S.C. § 360h(d) has meaning notwithstanding the scope of federal preemption this court has found concerning the Class III heart catheters at issue here.

■ The court recognizes, however, that this decision does conflict with the FDA's interpretation of the scope of federal preemption under 21 U.S.C. § 360k(a). One of the FDA's regulations concerning preemption, 21 C.F.R. § 808.1(d)(1), states that:

> Section [360k(a)] does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.

If this regulation governed the decision of this case, at least plaintiffs' state law claims of breach of warranty in violation of the Uniform Commercial Code ("U.C.C."), Mass. Gen.L. ch. 106, *et seq.*, and unfair trade practices, in violation of Mass.Gen.L. ch. 93A, would survive defendants' motion to dismiss.

■ As previously noted, this court recognizes that the FDA's "reasonable construction of [the MDA] is controlling if it is not contrary to Congressional intent." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781. However, "[t]he judiciary is the final authority on issues of statutory interpretation and must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9.

In their concurrence in *King,* Judges Aldrich and Campbell expressly found that the MDA was clear with regard to the preemption of claims concerning Class III medical devices and that, therefore, the FDA's interpretation, as expressed in 21 C.F.R. § 808.1(d), "must give way." 983 F.2d at 1139. *Contra Mulligan v. Pfizer,* 850 F.Supp. 633, 636 (S.D.Ohio 1994). Although the issue was not directly addressed in *Mendes,* its reasoning and result—dismissal of implied warranty claims based on the Massachusetts enactment of the U.C.C.—implicitly confirm this conclusion. 18 F.3d at 19.

To the extent, if any, this issue is not foreclosed by the decisions of the Court of Appeals for the First Circuit, this court agrees that, as applied to this case, the FDA's regulation, 21 C.F.R. 808.1(d)(1), conflicts with the clear expression of Congressional intent contained in 21 U.S.C. § 360k(a), and this court must follow the commands of Congress rather than the FDA's erroneous interpretation of them.

Accordingly, the court finds that notwithstanding plaintiffs' claims that defendants fraudulently obtained, and retained for a period, FDA approval for the three lumen Mini Profile catheter used in the angioplasty procedure which resulted in Eunice Beavers' death, 21 U.S.C. § 360k(a) operates to broadly preempt their state law claims.

C. *Each of Plaintiffs' Claims is Preempted.*

As indicated earlier, Judges Aldrich and Campbell in their concurrence in *King* interpreted 21 U.S.C. § 360k(a), as applied to Class III devices, to provide "maximum protection and express preemption, leaving no need to seek implications." 938 F.2d at 1139. Judge Torruella characterized that provision as "broad, but limited" in its preemptive scope. *Id.* at 1134. In *Mendes,* in considering a Class III device, the Court of Appeals for the First Circuit said that with regard to determining whether particular claims are preempted:

> Our first task is to outline the [FDCA's] requirements applicable to the device. Thereafter, we scrutinize plaintiff's claims, to determine whether the successful litigation of any of them would "establish or continue in effect" a "different" or "addition[al]" requirement. 21 U.S.C. § 360k(a). This analysis determines whether plaintiff's claims are preempted. 21 C.F.R. § 808.1(d) (state requirements are preempted where "there are . . . specific requirements applicable to a particular device under the act.").

18 F.3d at 16.

Applying this analytical framework to the present case, the court finds that all of plaintiffs' claims, whether based on the laws of Massachusetts or Missouri, are preempted.

1. *Claims that the Three Lumen Mini Profile Catheter was "Adulterated" are Preempted.*

 Plaintiffs make one argument which permeates their defense of the validity of the particular counts in their Second Amended Complaint. They allege that the three lumen Mini Profile Catheter used in Mrs. Beavers' angioplasty was "adulterated" within the meaning of the MDA and assert that claims concerning adulterated products are not preempted.

Plaintiffs' argument relies on dicta in *King* noting that, as the Court of Appeals for the Seventh Circuit observed in dicta in *Slater*, 961 F.2d at 1334, "the MDA does not preempt such claims as negligent implantation or removal of devices, or claims arising out of *contaminated* devices." *King*, 983 F.2d at 1135 (emphasis added); *see also*, 21 C.F.R. § 808.1(d)(6)(ii) (state or local requirement prohibiting manufacture of adulterated or misbranded products not generally preempted, unless it has effect of establishing substantive requirement for specific device which is different from, or in addition to, the federal requirement).

To the extent that the dicta in *King* and *Slater* suggest that the MDA does not preempt claims concerning Class III devices against actors other than a manufacturer—such as claims against doctors for negligent performance of medical procedures or for failure to obtain informed consent, *Slater*, 961 F.2d at 1334—this court is inclined to agree. This court doubts, however, that a claim of contamination of a Class III device would be sufficient to escape federal preemption. It is not, however, necessary to decide this issue in this case.

Plaintiffs do not, and cannot, claim that the three lumen Mini Profile catheter used in Mrs. Beavers' angioplasty was "contaminated" in any way unique to it. At the August 5, 1994 hearing, the parties agreed that particular device had not been saved or examined.

Rather, plaintiffs contend that the three lumen Mini Profile catheter generally was an "adulterated" product, within the meaning of 21 U.S.C. §§ 351(c), (e), and (f)(1)(B), be-cause the quality of the device fell below the standard represented, it did not meet the applicable performance standards, and its premarket approval was defective. Second Am. Compl. ¶¶ 21, 40. Plaintiffs note that products which are "contaminated" are deemed to be "adulterated" for the purposes of the MDA. 21 U.S.C. § 351(a). Thus, plaintiffs contend that all "adulterated" devices are "contaminated," and, therefore, exempt from preemption under the dicta in *King* and *Slater*.

This contention, however, is not correct. A medical device may be "adulterated" within the meaning of the FDCA without being contaminated. For example, a medical device which does not have the strength its manufacturer has represented to the FDA that it possesses is deemed to be "adulterated." 21 U.S.C. § 351(e). This does not, however, mean it is "contaminated"—a term not defined by the MDA.

To recognize an exception to the usual scope of federal preemption concerning Class III devices for products purported to be adulterated would, in effect, be to create a private right of action under the MDA. In this case, plaintiffs' claim that the three lumen Mini Profile catheter used in Mrs. Beavers angioplasty was "adulterated" or "contaminated," is merely a variation of their design, manufacture, and warning claims. The Court of Appeals for the Third Circuit has properly found that, "to the extent that [plaintiffs] adulteration claim is derivative of her other claims for inadequate design, manufacture, and warnings, she cannot overcome a finding of preemption merely by claiming that the product was adulterated." *Gile*, 22 F.3d at 544. Accordingly, plaintiffs' contention that the three lumen Mini Profile catheter used in Mrs. Beavers' angioplasty was "adulterated" and, therefore, "contaminated" does not save any claim that would otherwise be preempted.

2. *Plaintiffs' Remaining Claims are Preempted.*

 Counts one, five, and eight allege negligence claims against each defendant concerning the design, development and

manufacture of the three lumen Mini Profile catheter. These claims are preempted.

As a Class III device, the Mini Profile catheter was subject to PMA controls. The Court of Appeals for the First Circuit has held that:

> As the design, manufacture, marketing and sale of [a Class III device] is the subject of FDA regulation, [a] negligence claim is preempted. Otherwise, a finding of negligence would force [the manufacturer] to alter these aspects of [the device] in response to a finding of liability, or be subject to liability. Either result would impermissibly impose an additional or different state requirement upon the design, manufacture, marketing and sale of [the device].

*King,* 983 F.2d at 1136; *see also Mendes,* 18 F.3d at 18–19. *Contra Reiter v. Zimmer,* 830 F.Supp. 199, 204 (S.D.N.Y.1993); *Ministry of Health, Province of Ontario, Canada v. Shiley Inc.,* 858 F.Supp. 1426, 1439 (C.D.Cal.1994).

Count two asserts an implied warranty claim. In essence, plaintiffs contend that the catheter used in Mrs. Beavers' angioplasty was not safe and, therefore, did not meet its implied warranty of fitness.

The Court of Appeals for the First Circuit has decided that: "As an implied warranty is a requirement upon a product that arises exclusively from the operation of state contract law, this claim is preempted expressly by the MDA. Otherwise, it would impose a requirement additional to those imposed under the MDA." *King,* 983 F.2d at 1135–36. The Court of Appeals for the First Circuit further explained in *Mendes* that:

> Plaintiff's implied warranty is also preempted by FDA's good manufacturing practices. A factfinder considering that claim could find [the manufacturer] liable if a manufacturing defect rendered [the device] unreasonably dangerous.... This means that under Massachusetts law [the manufacturer] could be found liable even if it meticulously followed FDA's good manufacturing practices. For these reasons, plaintiff's breach of implied warranty claim is preempted.

18 F.3d at 19; *see also Kemp,* 835 F.Supp. at 1021 (breach of implied warranty of merchantability preempted even where fraud on agency alleged); *Michael,* 1994 WL 59349, *8 (same). This conclusion is equally applicable if the implied warranty is based on Missouri law, rather than Massachusetts law. *See Linegar v. Armour of America, Inc.,* 909 F.2d 1150, 1152 (8th Cir.1990); *Keener v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362 (Mo.1969) (adopting strict liability in tort as stated in *Restatement (Second) Torts* § 402A).

Count thirteen, which alleges plaintiffs' breach of express warranty claim, is also preempted. *King,* 983 F.2d at 1135. In essence, plaintiffs contend that Bard breached the Mini Profile catheter's express warranties because as a result of fraud the device was not, as represented, effectively approved by the FDA. Second Am.Compl. ¶ 92.

Plaintiffs rely, in part, on 21 C.F.R. § 808.1(d)(1), in which the FDA states that claims based on generally applicable provisions of the U.C.C. are not preempted by 21 U.S.C. § 360k(a), to save their express warranty claim. As explained earlier, however, this regulation is not controlling because it conflicts with the clear intentions of the statute as it applies in this case. *King,* 938 F.2d at 1139.

Similarly, plaintiffs' suggestion that *Cipollone* indicates that their express warranty claims are not preempted has been rejected by the Court of Appeals for the First Circuit. *King,* 938 F.2d at 1135. As the Court of Appeals for the First Circuit has recognized, in *Cipollone* the Supreme Court found that express warranties included in cigarette advertisements were not preempted because manufacturers were permitted to, and did, make warranties in advertising which went beyond the minimal federal labeling requirements for cigarettes. *Id.* In contrast:

> [T]he MDA has imposed much more extensive regulation upon Class III device manufacturers. The FDA retains rigid control over the entirety of the labeling and packaging of Class III products, largely displacing the ability of manufacturers to make additional claims. This high level of

control contrasts with the low level of control in *Cipollone,* and ensures that manufacturers will not be held liable for packaging and labeling imposed by the FDA. *Id.; Kemp II,* 851 F.Supp. at 272–74 & n. 1. In this case, plaintiffs do not allege that Bard made any statements in addition to those approved by the FDA; they merely contend that approval was improperly obtained. *See* Second Am. Compl. ¶ 92. As in *King,* this express warranty claim is preempted.

Counts eleven and twelve are variations on plaintiffs' express warranty claims. They allege that Bard fraudulently misrepresented and concealed information in obtaining FDA approval for the Mini Profile catheter. Plaintiffs argue that these claims are not preempted because they are based on a duty to tell the truth rather than a duty to warn. *See Cipollone,* —— U.S. at ——, 112 S.Ct. at 2623; *Forster v. R.J. Reynolds Tobacco Co.,* 437 N.W.2d 655, 662 (Minn.1989) (cigarettes). However, after noting that a claim based on a general duty not to deceive would fail in any event because the Massachusetts law concerning fraud requires privity between the victim and the seller, the Court of Appeals for the First Circuit in *King* found it to be expressly preempted because "the fraud claim is, at bottom, a failure to warn claim." 983 F.2d at 1136. This conclusion is equally applicable in this case.

Count twenty, which alleges Bard engaged in an unfair trade practice in violation of Mass.Gen.L. ch. 93A, is also preempted. While 21 C.F.R. § 808.1(d)(1) says that generally applicable state unfair trade laws are not displaced, as explained earlier this erroneous interpretation of 21 U.S.C. § 360k(a) does not govern the disposition of this case. Plaintiffs' claim under Mass.Gen.L. ch. 93A has the potential to impose state requirements in addition to, or different than, the FDA's requirements. It is, therefore, preempted.

Counts four, seven, and ten, which allege claims of negligent infliction of emotional distress against each defendant, are preempted too. To prove such claims, the plaintiffs must prove negligence. *See, e.g., Sullivan v. Boston Gas Co.,* 414 Mass. 129, 132, 605 N.E.2d 805 (1993); *Asaro v. Cardinal Glen-*

*non Memorial Hospital,* 799 S.W.2d 595, 599–600 (Mo.1990) (en banc). Since the plaintiffs' negligence claims are preempted, *Mendes,* 18 F.3d at 18–19; *King,* 983 F.2d at 1136, these claims are preempted as well.

Counts three, six, and nine, which seek punitive damages against each defendant, are also preempted because they are based upon preempted causes of action. *See Transgo, Inc. v. Ajac Transmission Parts Co.,* 768 F.2d 1001, 1024 (9th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); *Hunsaker v. Surgidev Corp.,* 818 F.Supp. 744, 755 (D.M.D.Pa.1992), *aff'd,* 5 F.3d 1489 (3d Cir.1993).

Counts sixteen, seventeen, and eighteen charge Bard, Prigmore, and Cvinar with battery. In essence, plaintiffs allege that the defendants committed a battery upon Mrs. Beavers because their misrepresentations to the FDA resulted in her not giving properly informed consent to the angioplasty procedure which resulted in her death. This is, however, merely another variation of plaintiffs' preempted failure to warn claim.

Counts fourteen and fifteen allege that Bard was negligent and grossly negligent in hiring, training, and supervising its employees. At best, these vague claims seem to allege that Bard is responsible for the misconduct of its employees. While a corporation can only operate through the people it employs, when, as here, the claims against those individuals are preempted, claims asserting the vicarious liability of their employer are also preempted.

Count nineteen charges Bard, Prigmore, and Cvinar with conspiring to violate the FDCA and Massachusetts law. As all of the claims against them individually are preempted, this conspiracy claim is preempted as well.

### III. *Conclusion and Order.*

In explaining the reasons for the express, maximum preemption they found in *King,* Judges Aldrich and Campbell stated that: "Public health is a valid federal purpose, and Congress can reasonably weigh possible loss to the idiosyncratic few against the benefits to the public generally." 983 F.2d at 1138.

In this case, the declared public policy of relying exclusively on the United States government to enforce civil as well as criminal standards concerning the Bard Mini Profile catheter has imposed a profound cost on the plaintiffs; they are deprived of the opportunity to litigate what may be a strong case to recover compensation for the damages they suffered as a result of their mother's death. As indicated earlier, this result may raise questions concerning whether complete preemption strikes the most appropriate balance between promoting innovation and reasonably assuring the safety of Class III medical devices.

The government has, however, been vigorous in establishing the civil and criminal liability of Bard for its conduct, in achieving the imposition of substantial fines on Bard, and in criminally prosecuting the individuals alleged to be responsible for Bard's misconduct. The government's efforts concerning Bard may suggest the reasonableness of Congress' decision to supplant individual actions with government enforcement when Class III medical devices are at issue.

However, balancing the cost to the few against the benefit to the public in deciding whether preemption is appropriate is a discretionary decision concerning public policy which is, in our democracy, committed to the politically accountable branches of government. Where, as applied in this case, a statute expresses the intent to preempt completely private causes of action, the court must faithfully give effect to that intention.

Accordingly, defendants' motion to dismiss is hereby ALLOWED.